**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| ***ex rel.* DR. CINDY BUCKMASTER,** | ) | |
| | ) | |
| **Relator** | ) | |
| | ) | |
| | ) | |
| **Plaintiff-Relator,** | ) | **Civil Action No. 3:22-cv-00059** |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BAYLOR COLLEGE OF MEDICINE,** | ) | |

**Defendant.**

**DEFENDANT BAYLOR COLLEGE OF MEDICINE'S**
**MOTION TO DISMISS**

## TABLE OF CONTENTS


INTRODUCTION ........................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 5

I. Relator's Allegations ................................................................................... 5

II. Procedural History ..................................................................................... 5

BRIEF OVERVIEW OF APPLICABLE LAW ................................................................ 6

STANDARD OF REVIEW ................................................................................... 7

SUMMARY OF THE ARGUMENT ........................................................................... 9

ARGUMENTS & AUTHORITIES............................................................................ 11

I. The FCA's Public Disclosure Bar Requires Dismissal of Relator's Suit............. 11

A. The Public Disclosure Bar Precludes Relator's Suit and Prevents Her From Receiving A Windfall. ......................................................................... 12

B. Relator's Allegations Rely on Facts That Were Publicly Disclosed in Qualifying Sources.................................................................................. 13

i. Relator's allegations are substantially similar to the information that was publicly disclosed in news articles published in 2018 and 2019. .......................... 15

ii. Public disclosures in FOIA reports supplement the public media disclosures. 18

iii. The Public Disclosure Bar requires dismissal even if Relator's allegations are only partly based on public disclosures. ................................................ 20

C. Relator Is Not an Original Source. ................................................................ 21

i. Relator did not voluntarily disclose these concerns prior to the 2019 Washington Post article, the other news articles, press releases, or publicly available Federal reports. ........................................................................ 22

ii. Relator does not provide "additional compelling facts" that were not already publicly disclosed. ............................................................................ 23

II. The Amended Complaint's General and Non-Specific Allegations Are Insufficient To State A Claim Upon Which Relief Can Be Granted. ............................................ 25

A. The Amended Complaint Fails To Plead a False Claim or a Scheme to Defraud With Particularity. .......... 27

i. Relator's fraud theory is based on BCM's noncompliance with an agency guidance document, which cannot create the basis for a FCA suit. .......... 27

ii. Relator relies on generalized, nonspecific allegations that BCM failed to comply, which do not state with particularity the purported fraud. .......... 28

a. Relator does not plead facts sufficient to know "what" about the claims were false or how the claims were false. .......... 29

b. Relator does not plead facts sufficient to know "who" at BCM she alleges defrauded the Government. .......... 30

c. Relator does not plead facts sufficient to know "when" the purported fraud occurred. .......... 31

B. The Amended Complaint Fails To Plead Materiality. .......... 32

i. Relator pleads materiality as a legal conclusion. .......... 33

ii. Relator concedes that the Government continued to pay BCM even after being aware of certain instances of noncompliance, undercutting any allegation of materiality. .......... 34

iii. Relator does not cite to any other instances where the Government refused to pay claims based on purported noncompliance with The PHS Policy. .......... 36

C. The Amended Complaint Fails To Plead Scienter. .......... 38

III. The Amended Complaint Fails To Plead Unlawful Retaliation. .......... 39

A. Relator Fails To Allege Facts To Show She Engaged in "Protected Activity" under Section 3730(h). .......... 40

B. Relator Similarly Fails To Allege Facts Showing That BCM Knew of Any Protected Activity. .......... 43

C. The Amended Complaint Fails To Allege That BCM Retaliated Against Relator for "Engaging in Protected Activity." .......... 45

CONCLUSION .......... 47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States ex rel. 3729, LLC v. Express Scripts Holding Co.*,
No. 19-CV-1199 TWR (WVG), 2023 WL 4056042 (S.D. Cal. June 16, 2023) ....... 3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....... 39

*United States ex rel. Briseno v. Hillcroft Med. Clinic Ass'n*,
No. 4:20-CV-02871, 2022 WL 17417178 (S.D. Tex. Dec. 5, 2022) ....... *passim*

*United States ex rel. Colquitt v. Abbott Labs.*,
858 F.3d 365 (5th Cir. 2017) ....... 12, 17

*United States ex rel. Colquitt v. Abbott Labs.*,
864 F. Supp. 2d 499 (N.D. Tex. 2012) ....... 17

*United States ex rel. Davis v. Dist. of Columbia*,
679 F.3d 832 (D.C. Cir. 2012) ....... 22

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
761 F. Supp. 2d 504 (S.D. Tex. 2011) (Harmon, J.) ....... 8

*United States ex rel. Falk v. Safran Grp. S.A.*,
No. 15-CV-00746-LHK, 2017 WL 235197 (N.D. Cal. Jan. 19, 2017) ....... 29

*United States ex rel. Farmer v. City of Hous.*,
523 F.3d 333 (5th Cir. 2008) ....... 37

*United States ex rel. Gage v. Davis S.R. Aviation, L.L.C.*,
623 F. App'x 622 (5th Cir. 2015) ....... 9, 29, 30

*United States ex rel. Gage v. Davis S.R. Aviation, L.L.C.*,
658 F. App'x 194 (5th Cir. 2016) ....... 31

*United States ex rel. Gage v. Davis S.R. Aviation LLC*,
No. A-12-CA-904-SS, 2014 WL 3007201 (W.D. Tex. July 2, 2014), ....... 29, 30

*United States ex rel. George v. Bos. Sci. Corp.*,
864 F. Supp. 2d 597 (S.D. Tex. 2012) ....... 43

*Gregory v. Hous. Indep. Sch. Dist.*,
No. CV H-14-2768, 2016 WL 5661701 (S.D. Tex. Sept. 30, 2016) .................... 28, 30

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) .......................................................................*passim*

*United States ex rel. Harman v. Trinity Indus. Inc.*,
872 F.3d 645 (5th Cir. 2017) .................................................................... 33, 34

*United States ex rel. Hebert v. Dizney*,
295 F. App'x 717 (5th Cir. 2008) ..................................................................... 31

*United States ex rel. Hendrickson v. Bank of Am., N.A.*,
343 F. Supp. 3d 610 (N.D. Tex. 2018), *aff'd*, 779 F. App'x 250 (5th Cir. 2019) ............................................................................................ 22, 24, 32

*United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*,
816 F. App'x 892 (5th Cir. 2020) .................................................................. 6, 38

*United States ex rel. Jamison v. McKesson Corp.*,
649 F.3d 322 (5th Cir. 2011) .............................................................. 12, 13, 20

*United States ex rel. Johnson v. Kaner Medical Group P.A.*,
No. 4:12-CV-757-A, 2014 WL 7239537 (N.D. Tex. Dec. 19, 2014)......................... 43

*United States ex rel. Johnson v. Raytheon Co.*,
395 F. Supp. 3d 791 (N.D. Tex. 2019) ............................................................ 41, 44

*United States ex rel. Jones v. Sutter Health*,
499 F. Supp. 3d 704 (N.D. Cal. 2020) (Koh, J.) ................................................. 17

*Kisor v. Wilkie*,
139 Ct. 2400 (2019) ......................................................................................... 27

*United States ex rel. Kraxberger v. Kansas City Power & Light Co.*,
756 F.3d 1075 (8th Cir. 2014) ............................................................................ 8

*United States ex rel. Ligai v. ETS-Lindgren Inc.*,
No. CIV.A. H-112973, 2014 WL 4649885 (S.D. Tex. Sept. 16, 2014), *aff'd sub nom. United States ex rel. Ligai v. ESCO Techs., Inc.*, 611 F. App'x 219 (5th Cir. 2015)........................................................................................ 42

*Little v. Shell Expl. & Prod. Co.*,
690 F.3d 282 (5th Cir. 2012)........................................................................... 13

*United States ex rel. Lockey v. City of Dallas*,
576 F. App'x 431 (5th Cir. 2014) ........................................................................ 13

*United States ex rel. Osheroff v. Humana, Inc.*,
776 F.3d 805 (11th Cir. 2015) ........................................................................ 8, 14

*United States ex rel. Patton v. Shaw Servs., L.L.C.*,
418 F. App'x 366 (5th Cir. 2011) (per curiam) .................................................. 39, 41

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ........................................................................................ 26

*United States ex. rel. Reed v. Keypoint Gov't Sols.*,
923 F.3d 729 (10th Cir. 2019) ........................................................................ 39, 40

*Robertson v. Bell Helicopter Textron, Inc.*,
32 F.3d 948 (5th Cir. 1994) ............................................................................ 42, 45

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
563 U.S. 401 (2011) ...................................................................................... 14, 18

*United States ex rel. Schutte v. SuperValu Inc.*,
143 S. Ct. 1391 (2023) .................................................................................. 37

*United States ex rel. Schweizer v. Canon, Inc.*,
9 F.4th 269 (5th Cir. 2021) ............................................................................ *passim*

*United States ex. rel. Schweizer v.* Océ N.V.,
677 F.3d 1228 (D.C. Cir. 2012) ...................................................................... 38

*United States ex rel. Simms v. Austin Radiological Ass'n*,
No. A-10-cv-914-AWA, 2013 WL 6837715 (W.D. Tex. 2013) ................................ 12

*United States ex rel. Sonnier v. Standard Fire Ins. Co.*,
84 F. Supp. 3d 575 (S.D. Tex. 2015) ............................................................... 8

*Stennett v. Premier Rehab., LLC*,
479 Fed. App'x 631 (5th Cir. 2012) ................................................................. 37

*United States ex rel. Stephenson v. Archer W. Contractors, L.L.C.*,
548 F. App'x 135 (5th Cir. 2013) .................................................................... 34

*United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*,
915 F.3d 1158 (8th Cir. 2019) ........................................................................ 40

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
125 F.3d 899 (5th Cir. 1997) ........ 25

*Thomas v. ITT Educ. Servs., Inc.*,
517 F. App'x 259 (5th Cir. 2013) (per curiam) ........ 39

*United States ex rel. Thomas v. Lockheed Martin Aeroparts, Inc.*,
Civ. No. 3:13-183, 2016 WL 47882 (W.D. Pa. Jan. 4, 2016) ........ 37

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016) ........ *passim*

*Voorhees v. Kelsey-Seybold Clinic*,
P.A., No. 4:18-CV-03748, 2021 WL 742887 (S.D. Tex. Jan. 29, 2021) ........ 25

*United States ex rel. Willard v. Humana Plan of Tex., Inc.*,
336 F.3d 375 (5th Cir. 2003) ........ 28

*United States ex. rel. Williams v. Martin-Baker Aircraft Co., Ltd.*,
389 F.3d 1251 (D.C. Cir. 2004) ........ 40

*United States ex rel. Winkelman v. CVS Caremark Corp.*,
827 F.3d 201 (5th Cir. 2016) ........ 23

*United States ex rel. Wismer v. Branch Banking and Trust Co.*,
12-cv-1894-B, 2013 WL 5989312 (N.D. Tex. Nov. 12, 2013) ........ 25, 26

*United States ex. rel. Yesudian v. Howard Univ.*,
153 F.3d 731 (D.C. Cir. 1998) ........ 39, 40

**Statutes**

7 U.S.C. § 2143(f) ........ 32

31 U.S.C. §§ 3729-3733 ........ 3

31 U.S.C. § 3730(b)(2) ........ 5

31 U.S.C. § 3730(e)(4) ........ 8, 14

31 U.S.C. § 3730(e)(4)(A) ........ 12, 24

31 U.S.C. § 3730(e)(4)(B) ........ 21

31 U.S.C. § 3730(h) ........ 5, 39, 41, 45

31 U.S.C. § 3730(h)(1) ........ 38, 39

42 U.S.C. § 289d ........ 1, 6

42 U.S.C. § 289d(1) ........ 6

42 U.S.C. § 289d(b)(1) ........ 7, 19

42 U.S.C. § 289d(d) ........ 32

Animal Welfare Act of 1966 ........ 6, 37

Health Research Extension Act of 1985 ........ 6

False Claims Act ........ 31, 37, 39, 41

Federal False Claims Act ........ 3

FOIA ........ *passim*

**Other Authorities**

9 C.F.R. § 2.38(k) ........ 6

Federal Rules of Civil Procedure 9(b) ........ *passim*

Federal Rules of Civil Procedure 12(b)(6) ........ *passim*

Rule 56 ........ 8

## INTRODUCTION

Defendant Baylor College of Medicine ("BCM") is one of the preeminent research institutes in the United States. Founded in 1900 and established as an independent institution in 1969, BCM's world-renowned reputation for research was built on a broad base of basic science research spanning all areas related to human health and disease. BCM has supported thousands of faculty scientists who have dedicated hundreds of hours each year on research efforts to make scientific breakthroughs, leading to innovations and scientific discoveries that have benefitted and improved the lives of countless people.

### BCM's Research Program

For decades, BCM has applied for, received, and relied upon grants from the National Institutes of Health ("NIH") to help fund its research efforts. To receive grant funding from NIH, BCM regularly and consistently provides information and submits assurances of compliance with relevant guidance to the Government including to the NIH and to the Office of Laboratory Animal Welfare ("OLAW"), regarding its research program. 42 U.S.C. § 289d.

BCM also reports certain incidents of noncompliance with relevant guidance, as required, and to both NIH and OLAW. OLAW and other agencies have also conducted site visits and communicated with BCM over the years regarding certain isolated incidents within BCM animal research labs. In addition, BCM's animal research labs have been scrutinized by organizations like the People for Ethical Treatment of Animals ("PETA") and the news media, which have seized opportunities to write and publish about certain incidents within BCM's research labs. Groups like the Animal Research Laboratory

Overview ("ARLO") have also requested, received, and later published Freedom of Information Action ("FOIA")-sourced Federal reports regarding BCM's labs, including correspondence between OLAW and BCM regarding reportable incidents that have occurred in BCM's animal research labs. This information was made public, and has been publicly available, years before the present lawsuit was filed. Despite this information and these public disclosures, the Government has continued, and in fact has never stopped, to provide funding to BCM's research programs.

**Dr. Cindy Buckmaster**

Relator Dr. Cindy Buckmaster ("Relator") is a former BCM faculty member and is well-aware of BCM's dedication to research efforts and BCM's requests for Government funding for its animal research program. She was the Director of BCM's Center for Comparative Medicine ("CCM") for nearly eight years, and before that, she was the Associate Director of Training and Operations and Associate Director of Training for CCM. Amended Complaint, ECF No. 13, at ¶ 32 [hereinafter "Am. Compl."]. In her role, she "oversaw the entire animal care program for the animals involved in biomedical research at BCM" and "successfully developed a comprehensive training and education program for laboratory animal technicians of all levels, including for 200+ staff members supporting a diverse range of laboratory animals across multiple buildings." *Id.* at ¶ 33. All of Relator's allegations that BCM defrauded the Government are based on purported incidents that occurred while Relator was the Director of the CCM and, in part, responsible for ensuring that BCM's animal research program complied with applicable laws.

**Relator's Whistleblower Lawsuit**

Relator filed this lawsuit in December 2021, seeking hundreds of millions of dollars of damages as a whistleblower from BCM and asserting claims under the federal False Claims Act ("FCA"). *See* 31 U.S.C. §§ 3729-3733. Relator alleges BCM violated the FCA by failing to report to the Government "serious or continuing noncompliance with [The PHS Policy]." Relator also asserts a claim for retaliation.

Relator, however, did not "blow the whistle" to the Government on purported fraud by BCM—Relator simply repackaged public information and information BCM had already provided to the Government about its animal research program and labeled it "illegal." This presents a fatal problem for Relator because any *qui tam* case that is substantially similar to publicly disclosed information must be dismissed under the public disclosure bar of the FCA. *See, e.g.*, *United States ex rel. 3729, LLC v. Express Scripts Holding Co.,* No. 19-CV-1199 TWR (WVG), 2023 WL 4056042, at *12 (S.D. Cal. June 16, 2023) (dismissing relator's complaint based on the FCA's public disclosure bar because Relator's allegations were "substantially similar" to those disclosed in public media sources since the "same actors, the same conduct, and the same risk were involved in both the prior disclosure and the relator's complaint.") (internal citations omitted). This well-established bar prevents relators, like Dr. Buckmaster, from receiving a windfall where the underlying facts alleged are sufficiently known to put the Government on the trail of the alleged fraud, and where the relator is not an original source of the information. Relator's case should be dismissed with prejudice on this ground alone.

Despite Relator's allegations that BCM violated the FCA by failing to report to the Government "serious or continuing noncompliance with [The PHS Policy]," Relator fails to identify either "an actually submitted false claim" or "both an alleged scheme to submit false claims and details leading to a strong inference that those claims were submitted." *See* Am. Compl. at ¶¶ 11, 56, 76–112; *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190-91 (5th Cir. 2009). Relator similarly fails to plead sufficient facts to show that BCM's purported conduct that was not disclosed would have been material to the Government's payment decision, or that BCM knowingly submitted false claims, as required by the FCA. Instead, Relator makes vague and conclusory statements that BCM failed to report certain instances of noncompliance and made false assurances that it was in compliance with an agency guidance document—but provides no examples or details of what BCM submitted to the Government that was purportedly false. These unsupported allegations are not enough to proceed to discovery.

Finally, while Relator claims that BCM retaliated against her for raising concerns, she does not allege facts to show that she ever alerted BCM of the alleged fraud she now contends occurred. Instead, she alleges that she raised concerns about certain compliance issues, hoping that those would be remedied. It was Relator's job, as Director of the CCM, to raise those types of concerns; thus, her allegations, even taken as true, would not have put BCM on notice that she was investigating or concerned about fraud because the concerns she raised were related to isolated instances of noncompliance in the research lab, not fraud.

For these reasons, BCM moves to dismiss Relator's Amended Complaint with prejudice pursuant to the FCA public disclosure bar and pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Relator's Allegations

Relator alleges BCM violated the FCA by not disclosing "serious and continuing noncompliance" with The PHS Policy, a policy that outlines certain guidelines for animal research. Am. Compl. at ¶¶ 11, 56, 76–112. Relator contends that BCM's labs "allowed unauthorized, untrained, and unqualified individuals to conduct surgeries," "failed to properly monitor research animals during surgery lists certain alleged instances of noncompliance at certain research labs, contending that," "failed to properly administer pain medication for surgical procedures," and "failed to properly maintain medical records" dating back to 2016. *See id.* at ¶¶ 11, 76–112. Relator alleges that BCM did not report those instances to the Government and provided assurances to the Government that it was complying with The PHS Policy. Relator also alleges that BCM violated the FCA's whistleblower protection provision. *See* 31 U.S.C. § 3730(h).

### II. Procedural History

Relator filed this *qui tam* lawsuit under seal on December 9, 2021. ECF No. 1. Pursuant to the FCA's qui tam procedures, the U.S. Department of Justice had an opportunity to investigate Relator's allegations while her Original Complaint remained under seal and to intervene in the case if it so chose. 31 U.S.C. § 3730(b)(2). It declined to intervene on December 14, 2022, and, on January 9, 2023, the Court unsealed the case

and directed Relator to serve BCM. *See* ECF Nos. 8 and 9. On April 3, 2023, Relator filed the Amended Complaint. *See* ECF No. 13.

**BRIEF OVERVIEW OF APPLICABLE LAW**

To survive a motion to dismiss, an FCA complaint must adequately plead: (1) "a false statement or fraudulent course of conduct;" (2) "made or carried out with the requisite scienter;" (3) "that was material;" and (4) "that caused the [G]overnment to pay out money or to forfeit moneys due (*i.e.*, that involved a claim)." *United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F. App'x 892, 896 (5th Cir. 2020) (internal citations omitted) (emphasis added).

The Animal Welfare Act and the Health Research Extension Act, which Relator contends are the two relevant acts here, govern the use of animals of biomedical research. Am. Compl. at ¶ 52-54. The Animal Welfare Act of 1966, 7 U.S.C. §§ 2131–2159, requires that research institutions receiving federal funds meet prescribed standards for the care and monitoring of animals used in their work. *See id*. §§ 2132(e), 2143(a); *see also* 9 C.F.R. § 2.38(k). The Health Research Extension Act of 1985 ("Extension Act"), 42 U.S.C. § 289d, authorizes the NIH to establish guidelines for the proper care of animals used in biomedical research. *Id.* § 289d(a). These guidelines are embodied in the Public Health Service Policy on Humane Care and Use of Laboratory Animals. 42 U.S.C. § 289d(1) (what Relator refers to as the "The PHS Policy"). *See* Am. Compl. at ¶¶ 56.

The PHS Policy sets forth certain instructions for the Institutional Animal Care and Use Committee ("IACUC"), including instructions that each research project "conforms

with the institution's Assurance and [] requirements" regarding the care of the animals.[1] *See* PHS Policy, *available at* https://olaw.nih.gov/policies-laws/phs-policy.htm#1. The PHS Policy instructs BCM, (through its Institutional Official) to "promptly" provide the NIH with a "full explanation" of the "circumstances and actions taken" to remedy: (i) "any serious or continuing noncompliance with [The PHS Policy]" or (ii) "any serious deviations from the * * * Guide[.]" PHS Policy § IV.F.3; *available at* https://olaw.nih.gov/policies-laws/phs-policy.htm. The Extension Act also provides that the IACUC shall "assure compliance with the guidelines established under [T]he PHS Policy." *See* 42 U.S.C. § 289d(b)(1).

## STANDARD OF REVIEW

The FCA's public disclosure bar and the pleading standards of Rules 9(b) and 12(b)(6) require the dismissal of Relator's *qui tam* action.

[1] The PHS Policy instructs the IACUC to ensure the following:

a. Procedures with animals will avoid or minimize discomfort, distress, and pain to the animals, consistent with sound research design.
b. Procedures that may cause more than momentary or slight pain or distress to the animals will be performed with appropriate sedation, analgesia, or anesthesia, unless the procedure is justified for scientific reasons in writing by the investigator.
c. Animals that would otherwise experience severe or chronic pain or distress that cannot be relieved will be painlessly killed at the end of the procedure or, if appropriate, during the procedure.
d. The living conditions of animals will be appropriate for their species and contribute to their health and comfort. The housing, feeding, and nonmedical care of the animals will be directed by a veterinarian or other scientist trained and experienced in the proper care, handling, and use of the species being maintained or studied.
e. Medical care for animals will be available and provided as necessary by a qualified veterinarian.
f. Personnel conducting procedures on the species being maintained or studied will be appropriately qualified and trained in those procedures.
g. Methods of euthanasia used will be consistent with the recommendations of the American Veterinary Medical Association ("AVMA") Panel on Euthanasia, unless a deviation is justified for scientific reasons in writing by the investigator.

"Since the FCA requires a court to dismiss a claim based on public disclosure, a court necessarily considers the alleged public documents in its dismissal." *United States ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1083 (8th Cir. 2014) (citing 31 U.S.C. § 3730(e)(4)). Thus, this Court may consider and take judicial notice of the documents that include prior public disclosures that bar Relator's action without converting the motion to dismiss into a motion for summary judgment. *See United States ex rel. Sonnier v. Standard Fire Ins. Co.*, 84 F. Supp. 3d 575, 583-85, 594 (S.D. Tex. 2015) (citation omitted); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 518 (S.D. Tex. 2011) (Harmon, J.) ("[T]he court may also take notice of matters of public record when considering a Rule 12(b)(6) motion."); *see also United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 811 (11th Cir. 2015) ("[A] district court may consider an extrinsic document even on Rule 12(b)(6) review if it is: (1) central to the plaintiff's claim, and (2) its authenticity is not challenged.").

The Fifth Circuit has also held that challenges under the FCA's public disclosure bar are necessarily intertwined with the merits of the case and can be properly treated as a motion for summary judgment even at the pleading stage. *See United States ex rel. Schweizer v. Canon, Inc.*, 9 F.4th 269, 272–73 (5th Cir. 2021) (affirming grant of motion for summary judgment at the pleading stage, finding the complaint was barred by the FCA's public disclosure bar). Thus, BCM asserts its public disclosure bar argument pursuant to both Rules 12(b)(6) and Rule 56.

Because Relator has asserted fraud under the FCA, Relator must comply with the particularity requirements of Rule 9(b), in addition to complying with Rule 12(b)(6)'s

requirements that the complaint contain sufficient facts to state a claim for relief that is facially plausible. *United States ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 F. App'x 622, 625 (5th Cir. 2015) (applying Rule 9(b) to FCA claims). Rule 9(b) requires, at a minimum, that Relator set forth the who, what, when, where, and how of the fraud–including either an alleged false claim or the alleged fraudulent conduct with reliable indicia that a false claim was submitted. *Id.*

## SUMMARY OF THE ARGUMENT

Relator alleges BCM violated the FCA by failing to report to the Government "serious or continuing noncompliance with [The PHS Policy]" as directed by The PHS Policy, and that she was retaliated against by BCM for raising concerns about instances of noncompliance with The PHS Policy. *See* Am. Compl. at ¶ 56. There are several independent reasons that compel dismissal of this action.

***First***, the FCA's public disclosure bar, requires dismissal of the suit, because the conduct that Relator alleges led to BCM's fraud—the purported "serious and continuing noncompliance" and false assurances of compliance—were publicly disclosed prior to Relator's filing of this FCA *qui tam* suit through the news articles, blog posts of Federal reports, and by BCM through its own reporting, and Relator is not an original source.

***Second***, Relator's entire theory of fraud is predicated on allegations that BCM failed to comply with guidelines set forth in The PHS Policy—an agency *guidance* document, not a law. The PHS Policy is guidance and does not have the full force and effect of the law; thus, noncompliance with The PHS Policy alone cannot form the basis of an FCA suit.

***Third***, the Amended Complaint does not identify ***even one*** false claim or any details of a fraudulent scheme, including the who, what, when, where, and how about the alleged false claim, assurance, or certification or the fraudulent scheme that includes reliable indicia leading to a strong inference that a false claim was submitted. For example, Relator does not point to any assurance or report that was allegedly false, and she does not describe what BCM reported or failed to report to the Government that would have made BCM's reports or assurances of compliance false, or any details of a purported scheme that BCM concocted to hide or "cover-up" instances in order to defraud the Government. Instead, the Amended Complaint relies on conclusory statements that BCM's actions violated the FCA, which are insufficient to plead fraud under Rule 9(b). If BCM had submitted a false claim to the Government or was scheming to do so, Relator, who had been in a leadership role at BCM for eight years, would be in a position to identify it or at least describe facts about that now.

***Fourth***, as Relator acknowledges, the Government has known about BCM's instances of noncompliance with The PHS Policy—through the Government's own inquiries, investigations, and routine communications with BCM. Even so, the Government has continued to extend research grant money to BCM for the program. Relator has not alleged any facts to suggest the Government's payment decision would have been different if had known about any additional isolated instances that Relator raises now, or any facts to suggest that BCM's failure to report any additional isolated instances would have been at all material to the Government's decision to continue granting research

funding to BCM. Relator also fails to plead facts to show that BCM knowingly submitted false claims to the Government.

Finally, even taking Relator's allegations as true that she raised certain concerns about noncompliance with The PHS Policy, Relator's concerns were never that BCM did not report certain instances to the Government or that BCM was committing fraud.

## ARGUMENTS & AUTHORITIES

### I. The FCA's Public Disclosure Bar Requires Dismissal of Relator's Suit.

Relator's core allegation is that BCM failed to disclose certain instances of non-compliance with surgical and training guidelines listed in The PHS Policy to NIH and other Government agencies. Am. Compl. at ¶¶ 11, 16, 76–115. Each of these instances, however, were publicly disclosed in both the news media and Federal reports as early as 2018—years before Relator filed this FCA *qui tam* suit. ***Dozens*** of news articles and Federal reports were published and made publicly available prior to December 2021, detailing conduct that was the same or substantially similar to Relator's allegations. These are all still publicly available today, published on various websites, and are described in the Index of Public Disclosures, Exhibit 1, and attached to this Motion, Exhibits 3-33. In fact, many of these sources include reports and disclosures that BCM made directly to the Government in correspondence with the Government, belying any plausible allegation that BCM hid or concealed, or failed to report, these instances from the Government, much less defraud the Government in violation of the FCA.

These numerous public disclosures bar and require dismissal of Relator's suit.

### A. The Public Disclosure Bar Precludes Relator's Suit and Prevents Her From Receiving A Windfall.

The FCA's public disclosure bar states, "[t]he court shall dismiss an action or claim under this section, unless opposed by the Government," if "substantially the same allegations or transactions as alleged in the action or claim . . . were publicly disclosed" in, among other sources, a "congressional, Government Accountability Office or other ***Federal report***" or "***in the news media***" unless the relator can show that she is an "original source" of the information. 31 U.S.C. § 3730(e)(4)(A). The public disclosure bar prevents relators from receiving an "unnecessary windfall" by bringing "parasitic" *qui tam* lawsuits based on publicly disclosed information, where the Government already "has notice of the [alleged] wrongdoing." *United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 373 (5th Cir. 2017).

The Fifth Circuit applies a three-part test to determine whether the public disclosure bar applies: (1) whether there has been a public disclosure of the factual allegations or transactions; (2) whether the *qui tam* suit is based upon such publicly disclosed allegations or transactions; and (3) if so, whether the relator is the original source of the information. *Schweizer*, 9 F.4th at 275; *see also United States ex rel. Colquitt*, 858 F.3d at 373; *see also United States ex rel. Simms v. Austin Radiological Ass'n*, No. A-10-cv-914-AWA, 2013 WL 6837715, *4 (W.D. Tex. 2013) (noting that courts in the Fifth Circuit apply the same three prong test under both the pre- and post-amendment public disclosure bar). The Court is not required to rigidly follow the three steps, however, as the Fifth Circuit has noted that "combining the first two steps can be useful, because it allows the scope of the relator's

action in step two to define the 'allegations or transactions' that must be publicly disclosed in step one." *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011).

"[O]nce the [defendant] has identified public documents that could plausibly contain allegations or transactions upon which the relator's action is based, ***the relator bears the burden of demonstrating that they do not***." *Id.* at 327 (emphasis added). Relator also bears the burden of establishing that she is an "original source" of the public disclosures in the manner defined by the statute. *United States ex rel. Lockey v. City of Dallas*, 576 F. App'x 431, 435 (5th Cir. 2014).

The Fifth Circuit has previously applied the public disclosure bar and affirmed dismissals of FCA complaints "when a *qui tam* action is even ***partly*** based upon public allegations or transactions . . . Even if [the relator] uncovered some nuggets of new, *i.e.*, non-public, information, [the relator's] claims of fraud are based at least ***in part*** on allegations already publicly disclosed." *Schweizer*, 9 F.4th at 275 (internal citations omitted). The Fifth Circuit has held that, for the public disclosure bar to apply, the "guiding query is whether 'one could have produced the substance of the complaint merely by synthesizing the public disclosures' description of a scheme." *Id.* (quoting *Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 293 (5th Cir. 2012) (quoting *Jamison*, 649 F.3d at 331)).

### B. Relator's Allegations Rely on Facts That Were Publicly Disclosed in Qualifying Sources.

Starting in 2018, ***three years*** before Relator filed her *qui tam* suit, public news media reports and publicly available Federal reports sourced through FOIA requests publicly

disclosed certain instances of noncompliance with The PHS Policy and investigations by OLAW and the United States Department of Agriculture ("USDA") into BCM's alleged violations of the Animal Welfare Act, its implementing regulations, and The PHS Policy. Am. Compl. at ¶¶ 18, 123; *see also* Index of Public Disclosures, Ex. 1 *and* S. Brinkmann Decl., Exs. 3-33. In fact, in a publicly disclosed 2018 letter, OLAW had expressed concerns about "serious programmatic compliance" in BCM's research laboratories, and placed BCM on "enhanced reporting" as a result—a letter that Relator not only acknowledges was written but cites in her Amended Complaint. *See* Am. Compl. at ¶¶ 18, 123, 125, 126, 131; *see also* Letter from Axel Wolff, Deputy Director, OLAW, to Dr. Adam Kuspa, Senior Vice President for Research at BCM, S. Brinkmann Decl., Ex. 3.

Relator's allegations are based on those same or substantially similar instances of purported noncompliance with The PHS Policy. *See* Am. Compl. at ¶¶ 18, 123, 125, 126, 131, 133, and 147. The ***same*** conduct that Relator alleges that BCM was "covering up" concerning its animal research programs was in fact publicly available and known to the Government and the public at large years before she filed suit, including many instances where BCM disclosed the incidents. These numerous news media reports and publicly available Federal reports provided in response to FOIA requests are listed in the Index of Public Disclosures, attached as Ex. 1, and provided in full as S. Brinkmann Decl., Exs. 3-33.

*i. Relator's allegations are substantially similar to the information that was publicly disclosed in news articles published in 2018 and 2019.*

News articles and press releases about BCM's animal research program, including identifying instances of purported noncompliance with The PHS Policy, establish public disclosure through the "news media." 31 U.S.C. § 3730(e)(4). *See Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 408 (2011) (finding that, consistent with the "generally broad scope" of the public disclosure bar, federal courts hold that the publication of information on ***any*** publicly available website qualifies as a disclosure in the "news media" under the FCA) (emphasis added); *see also Osheroff*, 776 F.3d at 813.

Below are just three examples of news articles that publicly disclosed the specific instances of BCM's "ongoing serious programmatic noncompliance," with The PHS Policy, which Relator now relies upon for her allegations that BCM violated the FCA.

| ***Allegations*** | ***News Article*** |
|---|---|
| **Washington Post** ***article, Caged raccoons drooled in 100-degree heat. But federal enforcement has faded.*** **(Aug. 22, 2019) Ex. 4** | |
| **Failed to properly administer anesthesia (¶¶ 81, 95, 102, 109)**<br>**Botched surgeries, killing animals during experiments (¶¶ 81, 88, 95, 109)** | "At Baylor College of Medicine in Texas, research labs that experiment on pigs and rabbits reported 13 incidents and 'noncompliances' in 2017 and 2018 to the federal Office of Lab Animal Welfare, a part of the National Institutes of Health that regulates federally funded animal research. Some involved surgeries that resulted in the deaths of four animals, including two rabbits that had been improperly anesthetized."<br>"In July 2018, the office sent a letter to Baylor, chastising it for 'ongoing serious programmatic noncompliance" related to surgeries and placing it on an "enhanced reporting schedule.' Copies on the letter was the USDA's director of animal welfare operations." |

<table>
<tr><th>Allegations</th><th>News Article</th></tr>
<tr><td colspan="2">Press Release from PETA, Animal Suffering, Death at Baylor College of Medicine Prompt Urgent Plea (Sept. 16, 2019) Ex. 5</td></tr>
<tr><td>Failed to properly administer pain medication for surgical procedures (¶¶ 88, 95, 102, 109)<br><br>Failed to follow proper sterile techniques during surgical procedures (¶¶ 81, 88, 95, 102, 109)<br><br>Failed to properly monitor research animals during surgery (¶¶ 81, 88, 95, 102)<br><br>Failed to properly administer anesthesia (¶¶ 81, 95, 102, 109)<br><br>Botched surgeries, killing animals during experiments (¶¶ 81, 88, 95, 109)</td><td>“From January 1, 2018, to January 31, 2019, alone, BCM reported 41 incidents that violated animal welfare provisions, including ones in which mice who’d been subjected to invasive experimental surgeries weren’t given adequate analgesics, experimenters failed to follow procedures to prevent contamination while performing surgery on mice and piglets, and two rabbits died after an anesthetic machine was improperly assembled. Mice who were subjected to craniotomies (incisions into the skull) weren’t given appropriate analgesics, a mouse started to regain consciousness in the middle of experimental surgery because the nose cone delivering anesthetics hadn’t been fitted properly, and two others were left to languish with acrylic on their bodies at the point of death, hunched over and moving slowly. Mice were also subjected to toe amputations that were either unapproved or carried out without anesthetics.”</td></tr>
<tr><td colspan="2">Press Release, Zachary Toliver, BCM Veterinarian Has One Job—to Protect Animals—and Has Apparently Failed Miserably, PETA Blog (Sept. 16, 2019) Ex. 6</td></tr>
<tr><td>Failed to properly administer pain medication for surgical procedures (¶¶ 88, 95, 102, 109)<br><br>Failed to follow proper sterile techniques during surgical procedures (¶¶ 81, 88, 95, 102, 109)</td><td>“Numerous mice subjected to experimental surgeries were left to suffer and die without being given analgesics in accordance with protocol—or were given expired analgesics. Reports showed that BCM staff amputated the toes of baby and adult mice without permission or anesthetics.”<br><br>“In one case, experimenters opened mice’s skulls and failed to administer adequate pain relief following the surgery. In another incident, an anesthetized mouse who was undergoing invasive surgery started to regain consciousness</td></tr>
</table>

| *Allegations* | *News Article* |
|---|---|
| **Failed to properly monitor research animals during surgery (¶¶ 81, 88, 95, 102)**<br>**Failed to properly administer anesthesia (¶¶ 81, 95, 102, 109)**<br>**Botched surgeries, killing animals during experiments (¶¶ 81, 88, 95, 109)**<br>**Failed to properly administer pain medication for surgical procedures (¶¶ 88, 95, 102, 109)**<br>**Violated DEA and OLAW requirements for drug use and maintenance, and administered expired drugs to research animals in violation of DEA and OLAW requirements (¶¶ 88, 102, 109)** | because the nose cone delivering inhalant anesthetics hadn't been fitted properly."<br>"One report detailed that experimenters didn't even use sterile techniques while performing surgery on mice and piglets. And two rabbits died as a result of complications caused by improper setup of the anesthetic machine."<br>"Three mice used in a tumor study weren't provided with proper monitoring, which would have required that they be euthanized before enduring extreme agony—suggesting that the tumors had become larger than the size that had been approved." |

These *Washington Post* and PETA blog posts and articles describe BCM's purported noncompliance with The PHS Policy in more detail than even the Amended Complaint does and are sufficient to set the Government on the trail of the fraud, if there was any fraudulent conduct. *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 525 (N.D. Tex. 2012), *aff'd sub nom. Colquitt.*, 858 F.3d 365.

*ii. Public disclosures in FOIA reports supplement the public media disclosures.*

Starting as early as July 2020, letters from OLAW to BCM regarding BCM's alleged noncompliance with The PHS Policy regarding its animal research program were obtained through a FOIA requested by ARLO, an animal research watchdog group formerly called the New England Anti-Vivisection Society. ARLO submitted at least 26 successful FOIA requests for correspondence between BCM and OLAW regarding potential noncompliance.[2] Starting on or around July 20, 2020, ARLO publicly posted OLAW's reports, including the correspondence itself, on its public website, which was well-before Relator filed her Original Complaint in December 2021.

The Government's responses to these FOIA requests are considered Federal reports and qualify as a source of a public disclosure under the FCA. *See United States ex rel. Jones v. Sutter Health*, 499 F. Supp. 3d 704, 712-13 (N.D. Cal. 2020) (Koh, J.) (citing *Schindler Elevator Corp.*, 563 U.S. at 404) (granting motion to dismiss a FCA case based, in part, on the public disclosure bar on the grounds that FOIA reports fall within the bar's prohibition.).

Just a few examples of these many Federal reports, which are all currently available online, and a comparison to specific paragraphs of the allegations in Relator's Amended Complaint allegations are represented in the below table:

[2] *See* S. Brinkmann Decl., Ex. 1, (including citations and URLs for each public disclosure cited herein and otherwise).

| *Government Report* | *Public Disclosure* | *Amended Complaint Allegations* |
|---|---|---|
| *OLAW Letter Re: Animal Welfare Assurance A3823-01 [OLAW Case 7U]*[3]<br><br>Publicly disclosed through FOIA Response on 08/12/2019 | "OLAW understands that eight mice received foot pad injections although this activity was not described in the approved protocol. Two of the mice sustained swollen feet." | Performed unapproved procedures (¶ 95) |
| *OLAW Letter Re: Animal Welfare Assurance A3823-01 [OLAW Case 8C]*[4]<br><br>Publicly disclosed through FOIA Response on 10/16/2019 | "OLAW understands that an experimental hypoxia chamber holding mice malfunctioned and 14 animals died." | Failed to properly monitor research animals in housing area (¶¶ 81, 95)<br><br>Botched surgeries, killing animals during experiments (¶¶ 81, 88, 95, 109) |
| *OLAW Letter Re: Animal Welfare Assurance A3823-01 [OLAW Case 8B]*[5]<br><br>Publicly disclosed through FOIA Response on 10/16/2019 | "OLAW understands that eight mice received recently expired sustained release analgesic." | Violated DEA and OLAW requirements for drug use and maintenance, and administered expired drugs to research animals in violation of DEA and OLAW requirements (¶¶ 88, 102, 109) |
| *OLAW Letter Re: Animal Welfare* | "our office understands that 33 mice on a PHS funded activity failed to receive a secondary dose of analgesic for cranial injections and failed to receive | Failed to properly administer pain medication for surgical procedures (¶¶ 88, 95, 102, 109) |

[3] *See* S. Brinkmann Decl., Ex. 8, OLAW Letter Re: Animal Welfare Assurance A3823-01 [OLAW Case 7U] (Aug. 12, 2019), https://arlo.riseforanimals.org/entity/BCM-college-of-medicine-1964/records/6963.

[4] *See* S. Brinkmann Decl., Ex. 9, OLAW Letter Re: Animal Welfare Assurance A3823-01 [OLAW Case 8C] (Oct. 16, 2019), https://arlo.riseforanimals.org/entity/BCM-college-of-medicine-1964/records/6971.

[5] *See* S. Brinkmann Decl., Ex. 10, OLAW Letter Re: Animal Welfare Assurance A3823-01 [OLAW Case 8B] (Nov. 17, 2019), https://arlo.riseforanimals.org/entity/BCM-college-of-medicine-1964/records/6970.

| *Government Report* | *Public Disclosure* | *Amended Complaint Allegations* |
|---|---|---|
| *Assurance A3823-01 [OLAW Case 8M]*[6]<br><br>Publicly disclosed through FOIA Response on 11/7/2019 | health evaluations as described in the protocol that was approved by the Institutional Animal Care and Use Committee (IACUC)." | |

The Federal reports (OLAW letters) specifically named BCM, and concerns about BCM's compliance with The PHS Policy and demonstrate that the Government had direct knowledge about these issues. Many of these also documents BCM's own disclosure to the Government about certain incidents. The Government had ample information to investigate if it believed that: (i) BCM's conduct raised "serious issues of non-compliance," rising to the level of fraud, or (ii) BCM's noncompliance would prevent it from providing an assurance that it was in "compliance with The PHS Policy." *See* 42 U.S.C. § 289d(b)(1). Instead, the Government continued to extend grants to BCM.

*iii. The Public Disclosure Bar requires dismissal even if Relator's allegations are only partly based on public disclosures.*

Relator's allegations regarding instances of noncompliance by BCM with The PHS Policy, and BCM's purported failure to report those to the Government or its assurances that it had complied, are at a minimum ***partly*** based upon or substantially similar to the public disclosures from news articles and FOIA-sourced Federal reports referenced in Sections I.B.i and I.B.ii. That is, even assuming Relator's Amended Complaint alleges

[6] *See* S. Brinkmann Decl., Ex. 11, OLAW Letter Re: Animal Welfare Assurance A3823-01 [OLAW Case 8M] (Nov. 17, 2019), https://arlo.riseforanimals.org/entity/BCM-college-of-medicine-1964/records/6981.

certain additional instances of noncompliance, under-reporting, or false assurances of compliance with The PHS Policy to the Government beyond those instances that were publicly disclosed, those examples do not save Relator's lawsuit from the public disclosure bar.

*United States ex rel. Schweizer* is instructive. *See Schweizer*, 9 F.4th at 276; *see also Jamison*, 649 F.3d at 329. In *Schweizer*, the relator brought suit against Cannon based in part on information in publicly disclosed documents but asserted additional allegations of fraud based on additional information regarding the fraudulent scheme that had not been publicly disclosed. The Fifth Circuit upheld the district court's dismissal of Schweizer's lawsuit against Canon, holding in part that "the allegations against Canon are more than even partly based upon the Océ allegations or transactions, and one could have produced the substance of the [Canon] complaint merely by synthesizing the public disclosures' description of the [Océ] scheme." *Schweizer*, 9 F.4th at 276 (cleaned up).

Here too, Relator's allegations that BCM did not comply with The PHS Policy are based on information that is and has been publicly available, and the information in these public disclosures could have at produced the substance of Relator's Amended Complaint simply by synthesizing that information and forming allegations regarding an alleged scheme to hide or conceal such instances.

### C. Relator Is Not an Original Source.

Because Relator's allegations mimic previously publicly disclosed information (news media and in Federal reports), Relator can only avoid dismissal if she qualifies as an "original source" of the information. 31 U.S.C. § 3730(e)(4)(B). To qualify as an "original

source," a relator must have: (1) voluntarily disclosed the information "to the Government" "prior to a public disclosure," or (2) "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and have "voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B). Relator's conclusory assertion that she "is the original source" does not satisfy either test. *See* Am. Compl. at ¶ 26.

*i. Relator did not voluntarily disclose these concerns prior to the 2019 Washington Post article, the other news articles, press releases, or publicly available Federal reports.*

Relator has not pled any facts to show that she voluntarily disclosed any new purported instances of noncompliance with The PHS Policy, or failure to report those, that would lead to the false claim prior to the August 22, 2019 *Washington Post* article, the September 16, 2019 PETA press release, or the 2018 Federal reports obtained through FOIA requests, which were published and made widely available to the public through ARLO's website as early as July 20, 2020. At most, Relator alleges that she shared "similar" concerns to those that OLAW had already expressed, and which were made public, during a September 19, 2019 meeting on the BCM campus regarding "whether the IACUC was complying with the federal requirements relating to surgical procedures." Am. Compl. at ¶ 165. Importantly, this meeting occurred 28 days ***after*** the *Washington Post* article was published regarding BCM being placed on "enhanced reporting," and three days ***after*** the PETA press release regarding researchers failing to follow procedures.[7]

---

[7] The *Washington Post* article was released on August 22, 2019, and PETA press release on September 16, 2019. *See* Exhs. 4-5

*ii. Relator does not provide "additional compelling facts" that were not already publicly disclosed.*

Relator also does not provide "additional compelling fact[s]" that are ***independent of and materially add*** to concerns of non-compliance at BCM's animal research program that had not been disclosed in the public media reports or in Federal reports cited above, such that Relator could be considered an "original source."

Relator's efforts to include the names of certain research labs, BCM faculty, and certain instances of alleged noncompliance simply restate the incidents that were already disclosed through the news media and Federal reports or were materially the same as those that were disclosed. Relator does not reveal anything that materially adds to the information already publicly available about BCM's research program and does not "add[] value" sufficient to overcome the public disclosure bar's prohibition on parasitic litigation. *United States ex rel. Davis v. Dist. of Columbia*, 679 F.3d 832, 839 n.4 (D.C. Cir. 2012).

Other courts in the Fifth Circuit have similarly rejected different relator's FCA allegations where they were based on information that was already publicly disclosed. *See Schweizer*, 9 F.4th at 269 (affirming dismissal) (rejecting a relator's argument that she was the original source, when his FCA complaint simply "***adopt[ed] and expand[ed]*** . . . the fraudulent scheme originally" described in the public disclosure); *United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 630 (N.D. Tex. 2018), *aff'd*, 779 F. App'x 250 (5th Cir. 2019) ("Relator's knowledge does not materially add to the publicly disclosed transactions" because the allegations were "merely the product and outgrowth of publicly disclosed information"); *United States ex rel. Winkelman v. CVS Caremark Corp.*,

827 F.3d 201, 210-13 (5th Cir. 2016) (public disclosures in the media and in a prior lawsuit already revealed the basic "anatomy" of the fraud and relator's added detail about the precise manner of fraud and specific examples of the fraud did not "materially add" information).

In fact, PETA identified many of those publicly available Federal reports and internet materials in a letter addressed to Harris County District Attorney Kim Ogg on March 29, 2022, over nine months before the Court ordered that this case be unsealed.[8] Using publicly available sources, PETA made allegations against BCM that are strikingly similar to the allegations in the Amended Complaint and requested that District Attorney Ogg "investigate and pursue enforcement action against [BCM] for its apparent violations of Texas's prohibitions against cruelty to animals."[9] For example, PETA alleges that "federal reports from [OLAW] . . . evidence that BCM engaged in experiments that deviated from protocols that had been approved by BCM's Institutional Animal Care and Use Committee." The letter states that the alleged deviations "resulted in death, mutilation, starvation, and/or unnecessary pain to animals under its care." *Id.* It offers 12 examples of BCM's alleged misconduct taken from many of the same OLAW reports cited in this Motion as examples of public disclosures.[10] The Amended Complaint makes substantially the same allegations—that BCM researchers deviated from IACUC-approved protocols—

[8] Letter from Regina Lazarus, Legal Fellow, PETA, to The Honorable Kim Ogg, Harris County District Attorney (Mar. 29, 2022) *available at* https://www.peta.org/wp-content/uploads/2022/03/From-PETA-Regarding-Baylor-College-of-Medicine.pdf. Ex. 12

[9] *Id.* at 2.

[10] *Compare id.* at 1–3 (citing various OLAW letters to BCM) *with* S. Brinkmann Decl., Exhs. 24, 27, and 32 (citing identical OLAW letters).

that were included in the March 29, 2022 PETA letter. *See* Am. Compl. at ¶¶ 82, 89, 96, 103, 110–112.

While the March 29, 2022 PETA letter was sent after Relator filed her Original Complaint and does not qualify as a public disclosure, the allegations in the letter demonstrate that Relator's knowledge "does not materially add to the publicly disclosed transactions" because the allegations were "merely the product and outgrowth of publicly disclosed information." *See Hendrickson*, 343 F. Supp. 3d at 630. Consequently, Relator is not an "original source" under § 3730(e)(4)(A), and the Amended Complaint thus must be dismissed as required by the public disclosure bar.

## II. The Amended Complaint's General and Non-Specific Allegations Are Insufficient To State A Claim Upon Which Relief Can Be Granted.

While the public disclosure bar precludes this action from proceeding, the Amended Complaint should be dismissed for the separate, independent reason that it fails to state a plausible claim for relief under Rule 12(b)(6) and fraud with particularity as required by Rule 9(b).

The FCA is not "an all-purpose antifraud statute," nor is it a "vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016). Importantly, Rule 9(b) stands as a gatekeeper to discovery: a tool to weed out meritless fraud claims sooner rather than later. *United States ex rel. Wismer v. Branch Banking and Trust Co.*, 12-cv-1894-B, 2013 WL 5989312, at *8 (N.D. Tex. Nov. 12, 2013) (dismissing *qui tam* complaint under Rule 9(b), which prevents discovery in suits that threaten to unnecessarily harm a defendant's

reputation and as a pretext to discover unknown wrongs); *Grubbs*, 565 F.3d at 185. "The Fifth Circuit has mandated that Rule 9(b)'s heightened standard for pleading is to be applied 'with bite and without apology.'" *Voorhees v. Kelsey-Seybold Clinic, P.A.*, No. 4:18-CV-03748, 2021 WL 742887, at *3 (S.D. Tex. Jan. 29, 2021), *report and recommendation adopted*, No. 4:18-CV-03748, 2021 WL 737122 (S.D. Tex. Feb. 25, 2021). Failure to meet Rule 9(b)'s heightened pleading standard "is considered a failure to state a claim under Rule 12(b)(6)." *Id.* (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997)).

Relator's Amended Complaint fails: (1) to identify even one false claim or plead facts sufficient to show a fraudulent course of conduct with an indicia of reliability that would lead to a strong inference that a false claim was submitted; (2) to plead sufficient facts to show that the purported instances of non-compliance were material to the Government's payment decision; and (3) to plead sufficient facts that BCM knowingly submitted a false claim. The Amended Complaint contains a number of broad, speculative conclusions, but a "dearth of real facts" and is precisely the type of complaint Rule 9(b) was designed to address. *See Wismer*, 2013 WL 5989312, at *7. Failure to dismiss would allow Relator to proceed with an Amended Complaint that does not meet Rule 9(b)'s standards and, more importantly, threatens to unnecessarily harm BCM's reputation, precisely as the *Grubbs* and *Wismer* courts warned.

## A. The Amended Complaint Fails To Plead a False Claim or a Scheme to Defraud With Particularity.

The *sine qua non* of a FCA violation is the submission of a false claim. *See Grubbs*, 565 F.3d at 188. Relator does not identify either "an actually submitted false claim" or "both an alleged scheme to submit false claims and details leading to a strong inference that those claims were submitted" as required by the Fifth Circuit in an FCA case. *Grubbs*, 565 F.3d at 190-91 (emphasis added). But, as a threshold matter, Relator's entire fraud theory is based on allegations of noncompliance with The PHS Policy, which is agency guidance and does not have the force and effect of law and therefore cannot be the basis of a false claim.

### *i. Relator's fraud theory is based on BCM's noncompliance with an agency guidance document, which cannot create the basis for a FCA suit.*

Relator's allegations are predicated on assertions that BCM failed to comply with certain guidance outlined in The PHS Policy. But The PHS Policy is an agency guidance document, and guidance documents "do not have the force and effect of law."[11] *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (internal citation omitted) (emphasis added). Thus, even assuming Relator's allegations are true that BCM failed to comply with The PHS Policy by failing to train its employees, failing to perform surgeries on animals as instructed, failing to use proper anesthesia, and that BCM failed to report those instances, those allegations cannot form the basis for an FCA violation, because they are based on

[11] *See also* Issuance and Use of Guidance Documents by the Department of Justice, Mem. Att'y Gen. (Jul. 1, 2021) at 1, *available at*, https://www.justice.gov/opa/page/file/1408606/download ("Unlike rules promulgated through the notice and comment process, therefore, guidance documents do not bind the public and are not treated as binding by the courts."). Ex. 36

instances of noncompliance with agency ***guidance***, not the law. Both the Supreme Court and DOJ has been clear that agency guidance documents like The PHS Policy cannot form the basis of for an enforcement action like this FCA *qui tam* suit.

> In the enforcement context, ***an agency guidance document by itself*** "never forms 'the basis for an enforcement action'" because such documents cannot "impose any 'legally binding requirements' on private parties." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019) (plurality opinion) (citation omitted). Instead, enforcement actions must be based on the failure to comply with a binding obligation, such as one imposed by the Constitution, a statute, a legislative rule, or a contract.

Issuance and Use of Guidance Documents by the Department of Justice, Mem. Att'y Gen. (Jul. 1, 2021) at 2. This alone is a reason for dismissal of Relator's lawsuit.

*ii. Relator relies on generalized, nonspecific allegations that BCM failed to comply, which do not state with particularity the purported fraud.*

The Amended Complaint lists purported instances of PHS Policy violations including allowing untrained individuals to conduct surgeries, botching surgeries, and failing to monitor surgeries properly. *See* Am. Compl. at ¶¶ 81, 88, and 95. To plead an FCA violation, Relator must link with specificity those allegations of noncompliance with The PHS Policy to an actual false statement made to the Government. Here, the Amended Complaint states, in conclusory fashion that, "BCM certified to the Government in its Assurance that its biomedical research was compliant with IACUC-approved protocols." *Id.* at ¶ 72. But Relator does not provide any details about BCM's "Assurance,"—including the who, what, where, when, and why that Assurance was false. The Amended Complaint conspicuously fails to identify: (i) which individuals were untrained to perform

surgeries and how were they untrained; (ii) which surgeries were botched and who botched them; or (iii) how BCM failed to monitor the research animals.

Further, Relator fails to include details on which specific misrepresentations or omissions were made on claims to NIH, OLAW, or a granting agency. While Relator's allegations may rely upon information and belief, she may not base claims of fraud on such speculative and conclusory allegations. *See Gregory v. Hous. Indep. Sch. Dist.*, No. CV H-14-2768, 2016 WL 5661701, at *4 (S.D. Tex. Sept. 30, 2016) ("[I]n addressing the 'what' and 'how' of a fraud, the Relator must plead 'what was false about the claims or how they were false.'"). Here, Relator fails to plead the what, who, and when of the purported fraud.

*a. Relator does not plead facts sufficient to know "what" about the claims were false or how the claims were false.*

The Amended Complaint fails to include details regarding what information in BCM's assurances or reports made them false claims. *Gregory*, 2016 WL 5661701, at *4 (citing *United States ex rel. Willard v. Humana Plan of Tex., Inc.*, 336 F.3d 375, 385 (5th Cir. 2003)). Relator's core allegation is that BCM failed to disclose certain instances of noncompliance with The PHS Policy—but she does not state what BCM ***should have told*** the Government that would have made the claims true. The Amended Complaint instead relies on broad, sweeping allegations that BCM did not comply with certain instructions and with the Animal Welfare Laws (without any detail or particularity), stating that there were "serious systematic instances of non-compliance" or "serious and continuing violations" with certain research protocols and then summarily concludes that such conduct

was not reported to the Government and was fraudulent. Am. Compl. ¶¶ 76–136. These conclusory allegations never tie any misrepresentation by BCM to a request for payment or a submission of a claim to the NIH, requesting payment, as required by the FCA. In other words, Relator's Amended Complaint fails because she does not and cannot specify and tie the purported misrepresentations or "cover-ups" to any "actually submitted false claim" or an "alleged scheme to submit false claims and details leading to a strong inference that those claims were submitted." *Grubbs*, 565 F.3d at 190–91 (emphasis added).

*b. Relator does not plead facts sufficient to know "who" at BCM she alleges defrauded the Government.*

Similarly, Relator has failed to plead facts sufficient to identify who submitted the purported false claim. Relator does not identify a single individual employed by BCM who supposedly submitted any false claim or were involved in a scheme to make the proper reports or assurances, even though Relator, as Director of the CCM would have had access to know who at BCM was submitting the false claim if one was submitted. Rule 9(b) requires Relator to provide the "identity of the person making the misrepresentation," which is not satisfied by merely providing the names of the corporate defendants. *United States ex rel. Gage v. Davis S.R. Aviation LLC*, No. A-12-CA-904-SS, 2014 WL 3007201, at *6 (W.D. Tex. July 2, 2014), *aff'd sub nom. United States ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 F. App'x 622 (5th Cir. 2015); *United States ex rel. Falk v. Safran Grp. S.A.*, No. 15-CV-00746-LHK, 2017 WL 235197, at *8 (N.D. Cal. Jan. 19, 2017)

(dismissing *qui tam* action alleging violations of the TAA where relator failed to plead the names of the employees or agents who purportedly made the false statements).

Unlike in *Grubbs*, where the complaint identified particular details of the fraudulent scheme to bill federal programs for medical appointments that did not occur and the particular individuals who made the false claims, the conclusory assertions Relator makes fail to shed any light on who at BCM made false submissions or assurances to the Government. *See United States ex rel. Briseno v. Hillcroft Med. Clinic Ass'n*, No. 4:20-CV-02871, 2022 WL 17417178, at *4 (S.D. Tex. Dec. 5, 2022), report and recommendation adopted, No. 4:20-CV-02871, 2022 WL 17834209 (S.D. Tex. Dec. 21, 2022).

*c. Relator does not plead facts sufficient to know "when" the purported fraud occurred.*

In addition, Relator failed to allege when the purported fraud occurred. She mentions different years, *i.e.*, 2016 through 2020, where there were issues relating to purported noncompliance with the Policy within the labs, but she does not state ***when*** the purported false claims were submitted to the Government. *See* Am. Compl. at ¶¶ 95, 102, 109, 117. "[I]n addressing the 'when' of a fraud, allegations must be more specific than a course of years." *Gregory*, 2016 WL 5661701, at *5 (finding relators' allegations that the fraud occurred over a course of years spanning from at least 2005 to 2013 failed to meet Rule 9(b)'s heightened pleading standard); *see also Gage*, 623 F. App'x at 627 (finding relator's allegation that defendant submitted nearly $4 million of false invoices to the Government between 2009 and 2011 was "not specific enough to comply with Rule 9(b)");

*United States ex rel. Hebert v. Dizney*, 295 F. App'x 717, 722–23 (5th Cir. 2008) (allegations that defendants routinely submitted bills over the course of seven years were not sufficiently specific under Rule 9(b)).

Taken together, Relator's fails to plead facts with particularity to demonstrate that BCM acted "with the purpose of getting a false claim paid by the Government." *Grubbs*, 565 F.3d at 192. This is a second, independent reason this *qui tam* suit cannot proceed.

**B. The Amended Complaint Fails To Plead Materiality.**

"As noted, a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be ***material*** to the Government's payment decision in order to be actionable under the False Claims Act." (emphasis added); *see Escobar*, 579 U.S. at 192; *see also id.* at 181 ("[w]hat matters is . . . whether the defendant *knowingly* violated a requirement that the defendant knows is *material* to the Government's payment decision") (emphasis added). "[M]inor or insubstantial" regulatory noncompliance is also insufficient, as is an allegation "that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id*. at 194. The standard for materiality is "rigorous" and, as with other elements of a FCA claim, requires relators to plead their claims with "plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b)." *Escobar*, 579 U.S. at 195 n. 6; *see also United States ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 658 F. App'x 194, 197 (5th Cir. 2016) (addressing *Escobar* footnote six in the context of a Rule 28j letter).

Relator recognizes that the Government placed BCM on "enhanced reporting" in 2018 because of the purported "serious and continuing noncompliance," and yet the

Government continued to pay BCM. *See* Am. Compl. at ¶¶ 18, 123, 125 ("Below are some examples of surgeries performed by untrained individuals after BCM was placed on enhanced reporting on July 11, 2018. The Government paid over $55 million in claims to these PI labs through 2023.").

*i. Relator pleads materiality as a legal conclusion.*

Relator alleges that "the Assurance is material to the Government's payment decision because a grantee that does not comply with its Assurance can have its grants 'suspended or revoked' and its funding ceased. A grantee may be first placed on enhanced reporting to provide it notice and an opportunity to correct. 42 U.S.C. § 289d(d); 7 U.S.C. § 2143(f)." *See id.* at ¶ 60. This is nothing more than a recitation of the law—a legal conclusion—not facts and are not sufficient to plead materiality. *See Hendrickson*, 343 F. Supp. 3d at 631 ("[T]he court does not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions. A plaintiff must provide more than labels and conclusions . . . .") (internal citations omitted).

Further, Relator relies on conclusory allegations that BCM's purported failure to disclose certain information to the Government was material to the Government's decision to continue providing grant funding and glosses over the fact that the Government knew about the alleged instances of non-compliance and still decided to continue extend grant funding to BCM for research purposes. *See, e.g.*, Am. Compl. at ¶¶ 137–156 ("BCM knew that compliance [was] material to the Government's decision to pay . . ."); ("BCM also knew that truthful reports to the federal grantors and OLAW, its regulatory oversight body,

including reports of 'serious or continuing' noncompliance and corrective actions taken, were material to the Government's decision to pay BCM for biomedical research grants.").

Relator's conclusory statements that noncompliance with The PHS Policy or failure to report these instances of noncompliance are "material" to the Government's payment decision are not sufficient to plead materiality under the FCA. In *Escobar*, the Supreme Court clarified that "statutory, regulatory, and contractual requirements are not automatically material [to the Government's payment decision], even if they are labeled conditions of payment." *Escobar*, 579 U.S. at 191.

*ii. Relator concedes that the Government continued to pay BCM even after being aware of certain instances of noncompliance, undercutting any allegation of materiality.*

Relator cannot overcome the fact that, despite the Government putting BCM on "enhanced reporting" based on issues reported in 2018 and OLAW's own site visit at BCM where OLAW could see first-hand BCM's research program, the Government continued to extend grant money to BCM. Relator even pleads facts to show that the Government had knowledge about these purported issues of non-compliance back in 2017. *See* Am. Compl. at ¶¶ 116–156. "Continued payment by the federal [G]overnment after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 663 (5th Cir. 2017).

None of the facts alleged in the Amended Complaint suggest that any misrepresentation would have changed the Government's payment decision here. As Relator acknowledges throughout, the Government continued to pay federal grant funds to

BCM in connection with its animal research programs from 2016 through the present. Am. Compl. at ¶¶ 80, 87, 94, 101, and 108. The evidence of continued payment is particularly striking in light of Relator's reliance on the July 2018 letter from OLAW to BCM, which plainly states that the Government was aware of "serious and continuing noncompliance" within BCM's animal research program. *Id.* at ¶ 147. The July 2018 letter further shows that the Government's remedy to "serious and continuing noncompliance" was not to cease payment of grant monies, but rather to place BCM on "enhanced reporting." *Id.* It is hard to imagine a better example evidence that the Government continued to pay a particular claim after learning of the alleged fraud than what Relator has included in her Amended Complaint. *See Harman*, 872 F.3d at 663.

Relator also alleges that BCM's failure to train certain individuals who performed surgeries "led to violations that were in 'serious noncompliance' with Animal Research Laws, BCM's Assurance, and IACUC-approved protocols." Am. Compl. at ¶ 126. But Relator admits in the Amended Complaint that OLAW "expressed concerns about whether the IACUC was complying with federal requirements relating to surgical procedures" as late as September 19, 2019. *Id.* at ¶ 165. Despite this contradiction, the Amended Complaint does not offer any examples in which the Government ceased paying grant money for violations related to failures to train individuals who performed surgeries. Indeed, "How could such 'fraud' be material to payment if the defrauded party knows about it and remains satisfied with the work?" *See United States ex rel. Stephenson v. Archer W. Contractors, L.L.C.*, 548 F. App'x 135, 138 (5th Cir. 2013).

*iii. Relator does not cite to any other instances where the Government refused to pay claims based on purported noncompliance with The PHS Policy.*

Further, Relator does not allege any examples of the Government ceasing to extend grant money to a research institute like BCM based on noncompliance of The PHS Policy, which Relator alleges BCM violated. *Escobar*, 579 U.S. at 195 (finding that noncompliance might be material if it is alleged that "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with ***the particular statutory, regulatory, or contractual requirement***.").

Here, Relator does not cite to a single analogous case where the Government determined that a failure to report noncompliance of The PHS Policy was material to its decision to extend a research grant. Each of the cases that Relator cites to as "proof" that the Government consistently refuses to pay such claims is categorically distinct from the conduct that Relator alleges in the Amended Complaint. Am. Compl. at ¶¶ 152–55. For example, the 2019 Duke University settlement with DOJ, which Relator cites in Amended Complaint ¶ 152, involved allegations that Duke "***falsified research***" to the NIH and EPA.[12] Nowhere in the Amended Complaint does Relator allege that BCM knowingly falsified or fabricated research data in its reports to OLAW. The falsification or fabrication of research data is a completely different allegation than alleged noncompliance with animal welfare regulations or protocols.

[12] Press Release, Dep't. of Justice, Duke University Agrees to Pay U.S. $112.5 Million to Settle False Claims Act Allegations Related to Scientific Research Misconduct (Mar. 25, 2019), https://www.justice.gov/opa/pr/duke-university-agrees-pay-us-1125-million-settle-false-claims-act-allegations-related. Ex. 37

Relator next cites to a 2023 settlement of a civil fraud lawsuit against Hunter College and one of its researchers. *Id.* at ¶ 153. That case is inapposite. The *Hunter* case involved allegations of a professor ***misappropriating NIH grant funds for personal expenses*** wholly unrelated to his research, including scuba diving trips and birthday parties.[13] There is no allegation or suggestion here that BCM, or any researcher at BCM, misappropriated grant funds in any way. The *Hunter* allegations are completely different in nature than the allegations in the Amended Complaint.

The two other cases cited by Relator, *United States v. Envigo*, and *United States ex rel. Humane Society of the United States v. Westland Meat Company et al.*, do not involve federal research grant funding at all. Am. Compl. at ¶¶ 154-155; *Envigo*, No. 6:22-cv-00028-NKM (W.D. Va.) (filed May 19, 2022); *Westland Meat Co. et al.*, No. 5:08-cv-00221 (C.D. Cal.) (filed Feb. 19, 2008). Relator suggests that the *Westland Meat Co.* and *Envigo* cases are germane to materiality, but neither case required the plaintiff to plead materiality under *Escobar's* "rigorous and demanding" standard. *Escobar*, 579 U.S. at 195. The *Westland Meat Company* case involved conduct that occurred prior to *Escobar's* release. *Westland Meat Co. et al.*, No. 5:08-cv-00221 (C.D. Cal.) (Mar. 29, 2010), ECF No. 43 at ¶¶ 18–80 (describing factual allegations against defendants beginning in 2003 and ending in 2008). The *Envigo* case did not involve a FCA claim, and the plaintiff had no obligation to plead materiality. Compl., *Envigo*, 6:22-CV-00028-NKM, ECF. No. 1 at ¶ 1 ("This is a civil action against Envigo RMS, LLC ("Envigo") for violations of the

[13] https://www.justice.gov/usao-sdny/pr/us-attorney-announces-settlement-civil-fraud-lawsuit-against-former-hunter-college. Ex. 38

Animal Welfare Act ("AWA") and its implementing regulations."). Furthermore, Relator admits that the *Envigo* case is not an FCA case, and that defendant was not an animal research institution but a facility that "deals in beagles." *See* Am. Compl. at ¶ 155 ("In a non-False Claims Act case . . ."); *cf.* Compl., *Envigo*, 6:22-CV-00028-NKM, ECF. No. 1 at ¶ 3 ("Envigo operates a facility . . . where it deals in beagles intended for use in research facilities.").

The Amended Complaint fails at every level to meet the "rigorous and demanding" standard for pleading materiality set forth in *Escobar*, 579 U.S. at 194-95.

**C. The Amended Complaint Fails To Plead Scienter.**

The Amended Complaint additionally fails because it does not allege a single fact suggesting that BCM had knowledge that any claim to the Government was false. *See United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391, 1399-1400 (2023) (explaining that defendants must act with "actual knowledge, deliberate ignorance, or recklessness" to violate the FCA); *see also Stennett v. Premier Rehab., LLC*, 479 Fed. App'x 631, 633 (5th Cir. 2012) (affirming dismissal of the complaint because it "fail[ed] to allege . . . that any of the [d]efendants acted with the requisite scienter to establish a cause of action under the [False Claims Act]"); *United States ex rel. Farmer v. City of Hous.*, 523 F.3d 333, 338 (5th Cir. 2008) (dismissal of FCA claim affirmed where the relator failed to establish defendant's knowledge that claims were false); *United States ex rel. Thomas v. Lockheed Martin Aeroparts*, *Inc.*, Civ. No. 3:13-183, 2016 WL 47882, at *8 (W.D. Pa. Jan. 4, 2016) (FCA claims dismissed where complaint failed to allege facts about defendant's alleged knowledge of falsity).

Relator's Amended Complaint states in a conclusory fashion that "BCM knowingly submitted or caused to be submitted false or fraudulent claims" and that BCM's animal research program submitted "false or fraudulent annual reports, Assurances, noncompliance reports, and progress reports to the Government, and knowingly failed to report noncompliance." Am. Compl. at ¶¶ 136, 140, 141. But the Amended Complaint does not include a single factual allegation about who at BCM purportedly knew that false statements or assurances were being made or that instances of noncompliance with The PHS Policy were not being reported. Relator provides no details or facts that would suggest that any instance of non-reporting would have been knowing. In fact, the publicly available information in the public disclosures make clear the BCM was reporting certain instances of non-compliance. Relator's allegations regarding BCM's scienter are legal conclusions, not well-pleaded or supported facts, and do not suffice to prevent dismissal under Rule 12(b)(6). *Integra Med Analytics, L.L.C.*, 816 F. App'x at 898 n. 21.

## III. The Amended Complaint Fails To Plead Unlawful Retaliation.

The FCA makes it unlawful for an employer to discriminate against an employee "because of lawful acts done by the employee . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). This text creates two distinct intent elements: the employee must act to further an FCA action or stop an FCA violation, and the employer must discriminate because the employee is so acting. To form the prohibited retaliatory intent, the employer therefore must know something about the employee's intent—that she was acting to further an FCA action or stop an FCA violation. *See, e.g.*, *United States ex. rel. Schweizer v. Océ N.V.*, 677 F.3d

1228, 1238 (D.C. Cir. 2012); *see also Briseno*, 2022 WL 17417178, at *6. This means that an employer must know that its employee either tried to further an FCA action or "tried to stop its alleged [FCA] violations." *United States ex. rel. Reed v. Keypoint Gov't Sols.*, 923 F.3d 729, 766 (10th Cir. 2019).

In sum, section 3730(h) requires an employee to prove that her employer was "on notice that she had tried to stop its alleged False Claims Act violations." *Id.* And an employer is unlikely be on notice when an employee does not raise concerns about fraud or simply does her job. *United States ex. rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 744 (D.C. Cir. 1998). On a motion to dismiss, the question is whether the employee has "pleaded facts that plausibly show" such notice. *Reed*, 923 F.3d at 766; *see Ashcroft v. Iqbal*, 556 U.S. 662, 667–84 (2009).

### A. Relator Fails To Allege Facts To Show She Engaged in "Protected Activity" under Section 3730(h).

To qualify as "protected activity" the activity must be "in furtherance of uncovering fraud or potential fraud against the Government." 31 U.S.C. § 3730(h)(1). The Fifth Circuit has confirmed the overarching principle that "[a] protected activity is one motivated by a concern regarding fraud against the [G]overnment." *Thomas v. ITT Educ. Servs., Inc.*, 517 F. App'x 259, 262 (5th Cir. 2013) (per curiam). Without a suggestion from the employee that she was "attempting to expose illegality or fraud within the meaning of the [FCA]," activity is not of the "protected" variety. *See United States ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x 366, 371 n.5 (5th Cir. 2011) (per curiam).

Furthermore, "plaintiffs alleging that performance of their normal job responsibilities constitutes protected activity must ***overcome the presumption*** that they are merely acting in accordance with their employment obligations to put their employers on notice." *United States ex. rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004) (emphasis added) (quotation marks omitted). Employers are unlikely to have the requisite notice if the employee "made no allegations of fraud" or the protected conduct was "part of his job." *Yesudian*, 153 F.3d at 744. For example, in *United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*, 915 F.3d 1158 (8th Cir. 2019), the Eighth Circuit affirmed the dismissal of claims brought by hospital employees who complained that the hospital had violated Medicare payment requirements, but not that the hospital's "behavior was fraudulent or potentially subjected it to FCA liability." *Id.* at 1168. The court reasoned that the complaints were not sufficiently connected to "fraudulent" activity to support a plausible inference of employer knowledge. *Id.* In *Reed*, the Tenth Circuit affirmed the dismissal of a retaliation claim after concluding that the alleged protected conduct involved the plaintiff's ordinary job responsibilities. *See Reed*, 923 F.3d at 767–71. This too makes sense: employers are unlikely to know that ordinary job activities are "efforts to stop" FCA violations, just as they are unlikely to know that those activities are "in furtherance of" an FCA action.

Here, Relator alleges that she took several actions in response to her "growing concerns about issues with staff training and the fact that BCM was falsely reporting to OLAW that it was complying with training requirements." Am. Compl. at ¶ 162. Relator points to several letters that she and her BCM-CCM employees sent to BCM's IACUC that

addressing "their collective ongoing concerns about BCM's failure to ensure individuals were trained before allowing them to perform surgeries." *Id.* at ¶ 163. Relator also alleges that she "continued to press the issue at a meeting with the IACUC around June 2018." *Id.* Relator also alleges that she raised concerns at a September 2019 meeting with OLAW and a subsequent email that she sent to OLAW regarding her "concerns about whether the IACUC was complying with federal requirements relating to surgical procedures." *Id.* at ¶ 165.

Relator makes no assertion in the Amended Complaint that she reported any concerns to BCM about fraud, about fraudulent conduct, or about a violation of the False Claims Act. *See Briseno*, 2022 WL 17417178, at *7 (finding a relator's failed to allege engaging in protected activity under § 3730(h) because relator failed to include "any examples of the actual substance" of her complaints). Further, Relator does not allege she "was attempting to expose illegality or fraud within the meaning of the False Claims Act." *United States ex rel. Johnson v. Raytheon Co.*, 395 F. Supp. 3d 791, 798 (N.D. Tex. 2019). Instead, Relator's allegations regarding her protected activity all relate to training failures within the animal research program. Am. Compl. at ¶ 163. She does not allege that any of the concerns she expressed involved fraudulent, illegal, or unlawful conduct, or false claims submitted to the Government. *Id.* at ¶¶ 163, 165. Mere feedback and criticism of BCM's training practices, without any indication that Relator was attempting to expose illegality or fraud, could not have provided BCM notice that Relator believed or was reporting any illegality or fraud and does not rise to the level of protected activity. This is especially true here, because it was part of Relator's job responsibilities to provide that

feedback. *See Patton*, 418 F. App'x at 372 (holding that relator's complaints concerning defendant's allegedly unsafe or improper construction methods and not concerning fraudulent activity did not constitute protected activity).

**B. Relator Similarly Fails To Allege Facts Showing That BCM Knew of Any Protected Activity.**

To bring an FCA retaliation claim for termination, a relator is required to show "that [her] employer had knowledge [she] engaged in protected activity." *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). Where there is no basis to believe that an employee is investigating fraud or trying to stop an FCA violation, there is no basis to infer the employer's knowledge of the employee's allegedly protected activity. *United States ex rel. Ligai v. ETS-Lindgren Inc.*, No. CIV.A. H-112973, 2014 WL 4649885, at *19 (S.D. Tex. Sept. 16, 2014), *aff'd sub nom. United States ex rel. Ligai v. ESCO Techs., Inc.*, 611 F. App'x 219 (5th Cir. 2015).

Here, Relator does not allege that she ever informed her supervisors not to submit false Assurance or annual compliance certifications, or to rectify pending false certifications of compliance. Instead, she allegedly reported "ongoing concerns about BCM's failure to ensure individuals were trained before allowing them to perform surgeries" (Am. Compl. at ¶ 163), and "similar concerns" to those expressed by OLAW at a September 2019 meeting regarding "compl[iance] with federal requirements related to surgical procedures" (Am. Compl. at ¶ 165). She also alleges that she sent an email to the Dean of BCM stating that she had "protested programmatic noncompliance" by BCM and

affiliated entities to OLAW and she would "consider any adverse action taken against [her] to be in retaliation." *Id.*

Relator's actions, even taken as true, would not be a basis for BCM to believe that she was "investigating fraud or trying to stop an FCA violation." Thus, there is no basis to infer BCM's knowledge of the employee's allegedly protected activity. Instead, Relator's actions are ones that would amount to "mere criticism by an employee of the employer's methods of conducting business" and perhaps a request for BCM to take corrective actions. *See United States ex rel. Johnson v. Kaner Medical Group P.A.*, No. 4:12-CV-757-A, 2014 WL 7239537, at *8 (N.D. Tex. Dec. 19, 2014), as corrected (Feb. 11, 2015). That is not enough to plausibly plead a cause of action for retaliation under the FCA.

In *United States ex rel. Johnson v. Kaner Medical Group P.A.*, the district court found that an email from the relator to her supervisor that "expressed concern" about her employer's billing practices for Medicare patients but did not suggest that the relator believed her employer was submitting false claims, "would not alert anyone" that she was engaged in protected activity. 2014 WL 7239537, at *9. Here, Relator similarly fails to allege that she informed BCM that she believed it was submitting false claims or that she was investigating or making inquiry into the subject of false claims. Consequently, based on Relator's own allegations taken as true, BCM was never put "on notice of a 'protected activity.'" *See Briseno*, 2022 WL 17417178, at *8.

### C. The Amended Complaint Fails To Allege That BCM Retaliated Against Relator for "Engaging in Protected Activity."

The third element of an unlawful retaliation claim requires proof that "the employer's retaliation was motivated by the protected activity." *United States ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597, 609 (S.D. Tex. 2012). To successfully plead this element, a relator must allege facts that support a causal connection between the protected activity and retaliation. *Raytheon* 395 F. Supp. 3d at 799.

In the first instance, Relator alleges that she "began to suffer ongoing harassment and retaliation" after she first raised her concerns about training failures. Am. Compl. at ¶ 164. Relator claims that she "regularly heard from other employees" that "the individual who was next in line to become Relator's boss" wanted "to find a way to push Relator out." *Id.* Relator further alleges that she heard that an individual submitted "an anonymous complaint" for her "behavior" during the June 2018 IACUC meeting. *Id.*

As with Relator's failure to plead the identity of any untrained individuals who performed surgeries, Relator's collective references to anonymous office gossip regarding her future supervisor and a complaint about her "behavior" is insufficient to plead a causal connection between her alleged protected activity and her termination. *See Raytheon*, 395 F. Supp. 3d at 799 (finding relator's failure to identify supervisors and their knowledge of his protected activity was insufficient to establish retaliatory intent).

Second, Relator alleges that BCM terminated her employment following her September 29, 2019 email to OLAW that "shared her similar concerns" regarding "whether the IACUC was complying with federal requirements relating to surgical procedures."

Am. Compl. at ¶ 165. As evidence of retaliatory intent, Relator alleges that she received an email from BCM's dean at 4:30 p.m. on September 30 asking her to meet. *Id.* Relator "had left for the day already" and was "unable" to meet with the Dean that day. *Id.* Relator alleges that she was "out sick" the following day and could not meet with the Dean but was able to send an email stating that she had "protested programmatic noncompliance" by BCM researchers, the IACUC, and IACUC Office to OLAW. *Id.* Relator further alleges that she informed the Dean in the same email that she would "consider any adverse action taken against me to be in retaliation for my having expressed my concerns and appropriately reported these concerns to OLAW-NIH." *Id.* According to the FAC, the Dean and an individual from Employee Relations terminated Relator's employment during a meeting the following day. *Id.* at ¶ 166.

Given that Relator did not adequately allege involvement in a protected activity, nor BCM's knowledge of that protected activity, the allegations in Paragraphs 165 and 166 are insufficient to establish a causal connection between her termination and her allegedly protected activity. *See Robertson*, 32 F.3d at 952 (concluding that employer lacked retaliatory intent to establish a violation of § 3730(h) where relator failed to establish that the employer was aware that relator's investigations were in furtherance of a *qui tam* suit). Here, Relator alleges that her email to OLAW merely "shared similar concerns" to those that OLAW employees expressed during the September 19, 2019 meeting at BCM. Am. Compl. at ¶ 165. Relator fails categorically to allege that she informed OLAW that she was investigating or aware of fraudulent claims for payment of grant monies, or other false claims for payment. Nor does Relator allege that she expressed concerns about false claims

to BCM. Consequently, Relator does not establish a causal connection between her termination and her allegedly protected activity. *See Briseno*, 2022 WL 17417178, at *8 (finding a relator could not establish a causal connection between her discharge and allegedly protected activity because she had not adequately alleged engaging in protected activity in the first place).

## CONCLUSION

The public disclosure bar requires dismissal of Relator's Amended Complaint. Moreover, Relator's allegations fail to meet the pleading standards required under Rules 12(b)(6) and 9(b).

Dated: July 10, 2023

Respectfully Submitted,

Sara Brinkmann
Attorney-in-Charge
Texas Bar No. 24069919
S.D. Tex. Bar No. 1287802
Adam Robison
Texas Bar No. 24035497
S.D. Tex. Bar No. 608250
KING & SPALDING LLP
1100 Louisiana Street, Suite 4100
Houston, Texas 77002
Tel: (713) 751-3200
Fax: (713) 751-3290
sbrinkmann@kslaw.com
arobison@kslaw.com

**ATTORNEYS FOR DEFENDANT BAYLOR COLLEGE OF MEDICINE**

## CERTIFICATE OF CONFERENCE

Pursuant to Rule 6 of the Galveston Division Rules of Practice, counsel for BCM and Relator conducted a telephonic conference on May 30, 2023, regarding deficiencies in Relator's Amended Complaint. *See* Gal. Div. R. Prac. 6. After the meet-and-confer, Defendant informed Relator, by letter served on June 2, 2023, of the right to amend the pleadings under the Galveston Division Rules of Practice and Fed. R. Civ. P. 15(a)(1)(B). *See* ECF No. 21.

*/s/ Sara Brinkmann*
Sara Brinkmann

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2023, a true and correct copy of the foregoing was served on all parties in accordance with the Federal Rules of Civil Procedure.

*/s/ Sara Brinkmann*
Sara Brinkmann