# EXHIBIT 38

An official website of the United States government
Here's how you know



PRESS RELEASE

# U.S. Attorney Announces Settlement Of Civil Fraud Lawsuit Against Former Hunter College Professor And Hunter College For Fraudulently Using Federal Research Funds

Monday, January 30, 2023

Share

**For Immediate Release**

U.S. Attorney's Office, Southern District of New York

## Jeffrey Parsons-Hietikko to Pay $375,000 and Admits to Seeking Reimbursements for Personal Travel. Hunter College to Pay $200,000 and Admits to Using NIH Funds to Pay Parsons' Staff for Time Spent Working on Projects Unrelated to the NIH Grants.

Damian Williams, the United States Attorney for the Southern District of New York, announced today that the United States has filed and settled a civil fraud lawsuit against HUNTER COLLEGE ("HUNTER") and JEFFREY T. PARSONS-HIETIKKO ("PARSONS"), a former HUNTER psychology professor who served as Director of Hunter's Center for HIV Educational Studies ("CHEST"). The lawsuit resolves the United States' allegations that for many years: (i) PARSONS improperly invoiced personal expenses to National Institutes of Health ("NIH") funds, including expenses related to scuba diving trips, international flights for his family, a tropical

birthday celebration, and travel for his work as a private consultant; (ii) HUNTER used NIH funds to pay PARSONS over $90,000 in retention bonuses without disclosing these payments to NIH as required; and (iii) PARSONS and HUNTER submitted false timekeeping records that misrepresented the time that CHEST staff spent working on NIH grant-related projects, resulting in the use of NIH grant funds to compensate CHEST staff for work performed for private clients. The lawsuit alleges that these impermissible uses of NIH funds violated HUNTER's certifications to NIH and the U.S. Department of Health and Human Services ("HHS") that the NIH funds would be used only for allowable research and academic purposes.

Under the settlement approved by U.S. District Judge Ronnie Abrams, PARSONS, 55, of Teaneck, New Jersey, and HUNTER agreed to pay $375,000 and $200,000, respectively, to the United States and made detailed factual admissions regarding their conduct.

U.S. Attorney Damian Williams said: "NIH provides funding to academic institutions for the purpose of furthering important research that impacts communities and improves lives. For years, Jeffrey Parsons-Hietikko obtained these funds under false pretenses, then used them to cover his personal expenses and for other purposes totally unrelated to research. Hunter College improperly used NIH funds to pay undisclosed bonuses to Parsons and for other expenses unrelated to NIH-funded work. When individuals and institutions abuse federal grant money, this Office will hold them accountable."

As alleged in the Complaint filed in Manhattan federal court:

During his time at HUNTER, where he was promoted on multiple occasions and achieved the status of Distinguished Professor in 2012, PARSONS proved himself to be singularly proficient at obtaining NIH funding to support his and CHEST's research. HUNTER considered PARSONS to be one of its most prized faculty members and offered him a number of perks, including discretionary spending accounts financed by NIH funds, a high level of personal control over CHEST's federal grant funds, and special accommodations in the approval process for obtaining reimbursements from federal funds for his expenses. PARSONS then abused his authority and influence by repeatedly drawing from these discretionary accounts to fund personal expenses.

From January 1, 2010, through May 17, 2018 (the "Covered Period"), PARSONS and HUNTER defrauded the United States by materially misusing federal funds obtained from NIH and making false certifications and statements to NIH and HHS. First, PARSONS defrauded the Government by improperly using NIH funds that HUNTER had certified to HHS would only be used to support the facilities and administrative costs associated with HUNTER's NIH grants (the "Indirect Cost Funds") to reimburse himself for his personal travel expenses, including expenses relating to personal scuba diving trips, international flights for his family, and a tropical birthday celebration. PARSONS falsely represented that these reimbursement requests all had an academic or research purpose. PARSONS also improperly used Indirect

Cost Funds to double the reimbursement he received for travel relating to his non-NIH-related work as a private consultant to external clients.

From December 2010 through December 2013, HUNTER improperly used the Indirect Cost Funds to pay PARSONS over $90,000 in undisclosed retention bonuses, even though NIH rules and regulations prohibited the Indirect Cost Funds from being used to make such payments. HUNTER never disclosed and, indeed, took steps to hide its use of the Indirect Cost Funds to pay these bonuses to PARSONS.

During the Covered Period, PARSONS also misused CHEST's NIH grant funds to pay CHEST staff for time they spent working for CHEST's private consulting clients, rather than on NIH grant-related projects. In order to obtain NIH funds for this purpose, PARSONS approved timekeeping records representing that those staff spent their time and effort working on NIH-funded research projects. In reality, however, CHEST staff had also spent time working on unrelated projects commissioned by third parties, which were not properly reimbursable from the NIH grant funds and were not accurately reflected on the documents PARSONS submitted to obtain reimbursement. Although HUNTER was on notice that CHEST staff performed work on outside projects, it nevertheless sought and received NIH funds to improperly pay CHEST staff for this outside work. The third parties that commissioned CHEST to work on the outside projects separately paid for the work performed by CHEST staff. HUNTER directed those payments into discretionary accounts to benefit CHEST and PARSONS, including one account used to reimburse PARSONS for alcohol expenses. Moreover, even after HUNTER became aware that NIH-funded CHEST staff had been improperly utilized to perform work for PARSONS's private consulting company, HUNTER never took steps to investigate or report to NIH this misuse of NIH funding.

As part of the settlement, PARSONS admits, acknowledges, and accepts responsibility for the following conduct:

- From 2013 through 2017, PARSONS requested reimbursement from Indirect Cost Funds for scuba diving trips to the Cayman Islands, Bonaire, Cuba, Costa Rica, Fiji, Cozumel, and Belize (the "Scuba Trips"). As part of his request for reimbursement from Indirect Cost Funds, PARSONS represented that the Scuba Trips had a research purpose. However, PARSONS did not create any documents, data, or records reflecting research he conducted while he was on the Scuba Trips.
- In addition to the Scuba Trips, from 2016 through 2017, PARSONS also requested reimbursement from Indirect Cost Funds for travel to Cape Town (the "Cape Town Trip") and Puerto Rico (the "Puerto Rico Trip," and together with the Cape Town Trip, the "Personal Trips"). As part of his request for reimbursement from Indirect Cost Funds for the Personal Trips, PARSONS represented that the Personal Trips had an academic purpose.
- From 2016 through 2018, PARSONS sought and received reimbursement from Indirect Cost Funds to reimburse himself for travel to Denver, Chicago, and Los Angeles. However,

during these trips, PARSONS was not working on projects relating to CHEST's NIH grants and, instead, was working as a consultant for other institutions. PARSONS did not reimburse HUNTER or NIH for any of the Indirect Cost Funds he received relating to his travel to Denver, Chicago, and Los Angeles as a consultant for other academic institutions.

- Throughout the Covered Period, PARSONS caused HUNTER to request NIH grant funds to pay the salaries of CHEST staff ostensibly working on CHEST's NIH-funded research. PARSONS approved a spreadsheet that purported to reflect the percentage of time and effort that CHEST staff spent working on CHEST's NIH-funded research (the "Staff Allocation Spreadsheet"). During the Covered Period, CHEST staff not only worked on projects connected to HUNTER's own NIH-funded research, but also on unrelated projects commissioned by third parties ("Outside Projects"). During the Covered Period, the Staff Allocation Spreadsheet failed to accurately reflect the time and effort CHEST staff spent working on the Outside Projects. Instead, during the Covered Period, the Staff Allocation Spreadsheet reflected CHEST staff as working entirely on CHEST's NIH-funded research.

As part of the settlement, HUNTER admits, acknowledges, and accepts responsibility for the following conduct:

- During the Covered Period, HUNTER was aware that CHEST staff worked on Outside Projects and received payments from third parties for that work. However, the staff's work on many of the Outside Projects was not reflected on the Staff Allocation Spreadsheet at all, and when it was, the Staff Allocation Spreadsheet understated the time that CHEST staff spent working on those Outside Projects. Instead, the time and effort of CHEST's staff on the Outside Projects was incorrectly allocated on the Staff Allocation Spreadsheet to projects that NIH funded directly through NIH grants. HUNTER, in reliance on these incorrect Staff Allocation Spreadsheets, sought and received reimbursement from the NIH for staff time and effort expended on the Outside Projects.
- HUNTER deposited the funds it received as payment for CHEST's staff work on the Outside Projects into accounts to benefit CHEST and PARSONS, and one of these accounts was used to reimburse PARSONS for expenses for alcohol at CHEST-related events.
- From December 2010 through December 2013, HUNTER used Indirect Cost Funds to pay PARSONS over $90,000 of retention bonuses, which were never disclosed to NIH. Throughout the Covered Period, NIH rules and regulations prohibited the use of Indirect Cost Funds to pay faculty retention bonuses not previously disclosed to NIH.

In connection with the filing of the lawsuit and settlement, the Government joined a whistleblower lawsuit that had previously been filed under seal pursuant to the False Claims Act.

* * *

Mr. Williams praised the outstanding investigative work of the Federal Bureau of Investigation and the Office of Inspector General for HHS.

This case is being handled by the Office's Civil Frauds Unit. Assistant U.S. Attorney Jessica Jean Hu is in charge of the case.

**Contact**

Nicholas Biase

(212) 637-2600

*Updated January 30, 2023*

---

**Attachments**

Hunter_and_Parsons_Complaint.pdf [PDF, 2 MB]

Parsons_Settlement.pdf [PDF, 1 MB]

Hunter_Settlement.pdf [PDF, 2 MB]

**Topics**

FALSE CLAIMS ACT

FINANCIAL FRAUD

**Component**

USAO - New York, Southern

Press Release Number: 23-029

# Related Content

PRESS RELEASE

**Former Partner Of Investment Management Firm Arrested For $1.6 Million Investment Fraud Scheme**

July 6, 2023

PRESS RELEASE

## U.S. Attorney Announces Charges In Four Separate Insider Trading Cases Against 10 Individuals, Including Drug Company Employees, Investment Firm Executive Director, And SPAC Investors

June 29, 2023

PRESS RELEASE

## Recidivist Defendant Pleads Guilty In Connection With Million-Dollar Fraud Scheme Targeting Senior Executives Of Investment Firms

June 29, 2023

**Southern District of New York**

One St. Andrew's Plaza

New York, NY 10007

Main Office & Criminal Division: (212) 637-2200

U.S. Department of JUSTICE

Archives

Budget & Performance

FOIA

Accessibility

Legal Policies & Disclaimers

Privacy Policy

For Employees

Information Quality

Office of the Inspector General

No FEAR Act Data

Small Business

Vote.gov

Español

**Have a question about Government Services?**

Contact USA.gov