**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA *ex rel.* DR. CINDY BUCKMASTER,** | ) | |
| **Plaintiff-Relator,** | ) | **Civil Action No. 3:22-cv-59** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BAYLOR COLLEGE OF MEDICINE,** | ) | |
| **Defendant.** | ) | |

**<u>RELATOR'S RESPONSE TO DEFENDANT BAYLOR COLLEGE OF MEDICINE'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS


**Introduction** .......... **5**

**Factual Background** .......... **6**

**Standard of Review** .......... **10**

**Summary of the Argument** .......... **11**

**Law and Argument** .......... **12**

**I. There was not a Public Disclosure.** .......... **12**

a. The Complaint is Not Based Upon Publicly Disclosed Information. . 13

b. Relator's Disclosure was Critical in Setting the Government on the Trail of Fraud by BCM. .......... 14

c. Dismissal is Inappropriate at this Time .......... 15

**II. Relator's First Amended Complaint Contains Sufficient Detail in Accordance with Fifth Circuit Precedent.** .......... **16**

**III. The Amended Complaint Satisfies the Materiality Standard Under the FCA.** .......... **22**

a. Relator denies that the Government continued to pay BCM with full and actual knowledge of the noncompliance .......... 25

b. Relator is not required to cite to other instances where the Government refused to pay claims based on noncompliance with the PHS Policy. .......... 29

**IV. Relator has adequately alleged retaliation.** .......... **30**

a. Relator adequately pleaded that she engaged in protected conduct. . 32

b. Relator adequately alleged that BCM knew of her protected conduct. 33

c. Relator adequately pleaded that Defendant retaliated against her for engaging in protected conduct. ........ 34

**Conclusion........ 35**

## TABLE OF AUTHORITIES

### Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........ 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........ 10

*Feist v. Louisiana, Department of Justice, Office of the Attorney General*, 730 F.3d 450 (5th Cir. 2013) ........ 34

*Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236 (5th Cir. 2019)........ 29, 33

*Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141 (5th Cir. 2009)........ 11

*Harmon v. City of Arlington*, 16 F.4th 1159 (5th Cir. 2021)........ 10

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ........ 23

*Miniex v. Houston Hous. Auth.*, 400 F. Supp. 3d 620 (S.D. Tex. 2019)........ 31

*Thomas v. ITT Educ. Servs., Inc.*, 517 F. App'x 259 (5th Cir. 2013)........ 31

*United States ex rel Solomon v. Lockheed Martin Corp.*, 878 F.3d 139 (5th Cir. 2017) ........ 12

*United States ex rel. Colquitt v. Abbott Lab'ys*, 864 F. Supp. 2d 499 (N.D. Tex. 2012) ........ 13, 14

*United States ex rel. Gear v. Emergency Med. Assoc. of Ill., Inc.*, 436 F.3d 726 (7th Cir.2006)........ 14

*United States ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597 (S.D. Tex. 2012) .......... 32, 33

*United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009) .... 17, 20

*United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322 (5th Cir. 2011) .......... 11, 12

*United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322 (5th Cir. 2011) .......... 13

*United States ex rel. Reagan v. E. Texas Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168 (5th Cir. 2004) .......... 12

*United States ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-CV-3396, 2014 WL 2618158 .......... 30

*United States ex rel. Schweizer v. Canon, Inc.*, 9 F.4th 269 (5th Cir. 2021) .. 11, 15

*United States ex rel. Sonnier v. Standard Fire Ins. Co.*, 84 F. Supp. 3d 575 (S.D. Tex. 2015) .......... 14

*United States ex. rel. Baltazar v. Warden et al.*, 635 F.3d 866 (7th Cir. 2011) .......... 14

U*nited States ex. rel. Laird v. Lockheed Martin Eng'g & Sci. Servs., Co.*, 336 F.3d 346 (5th Cir. 2003) .......... 13

*United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d. 890 (9th Cir. 2017) .......... 27

*United States ex rel. Escobar v. Universal Health Servs.*, 842 F.3d 103 (1st Cir. 2016) .......... 23

*United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645 (5th Cir. 2017) .......... 26, 27

*United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d. 155 (5th Cir. 2019) ........ 29
*United States ex rel. Montcrieff v. Peripheral Vascular Associates, P.A.*, No. SA-17-CV-00317-XR, 2023 WL 139319 (W.D.Tex. Jan. 9, 2023) ..... 26, 27, 30
*United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822 (6th Cir. 2018) ........ 23, 25, 29
*United States v. Hodge*, 933 F.3d. 468 (5th Cir. 2019) ........ 30
*Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 136 S. Ct. 1989, 195 L. Ed. 2d 348 (2016) ........ 22, 23, 27, 28

**Statutes**

31 U.S.C. § 3729(b)(4) ........ 22
31 U.S.C. § 3730 ........ 30, 34
Federal Rule of Civil Procedure 12(b)(6) ........ 10

## INTRODUCTION

This is a case of a massive fraud perpetuated by a long-standing and highly regarded educational and research institute. Defendant, Baylor College of Medicine ("BCM"), sought and received numerous federal grants to use animals to research various diseases including ovarian and breast cancer, epilepsy, and premature births, in order to save lives. However, BCM's actions wasted the lives of the animals used in research. In doing so, BCM allowed untrained individuals to perform surgeries and experiments, leading to botched surgeries including the pain, suffering, and death of research animals.

This pain, suffering, and death undermined the validity of the research for which federal taxpayer money paid. Instead of properly reporting this to the federal government, as they were required to do, BCM sought to conceal their failures so they could continue to receive research grants, or reported half-truths in order to convince the government to keep the funding spigot turned on, such as reporting non-compliance as isolated rather than programmatic and misrepresenting that such noncompliance had no impact on animal welfare or research data. Furthermore, when the director of BCM's Center for Comparative Medicine ("CCM") sought to report her concerns, BCM simply terminated her employment.

## FACTUAL BACKGROUND

Relator, Cindy Buckmaster, Ph.D., "is highly respected and widely known in the lab animal care scientific research community. Am. Compl. ¶ 30. "Relator is past-Chair of Americans for Medical Progress (and was the then-Chair during the retaliation period), the President of the Texas Society for Biomedical Research, past-President of the Laboratory Animal Welfare Training Exchange, and past-President of the American Association for Laboratory Animal Science, among numerous other scientific affiliations." *Id.* She has "authored scientific articles, speaks to audiences around the globe, and contributes to publications relating to the use of animals in biomedical

research" and "is also frequently interviewed by the media based on her knowledge of basic research and laboratory animal care." *Id.* at ¶ 31. Finally, "Relator holds half a dozen certifications in animal welfare and has received 8 different awards such as "Above and Beyond Award for dedication above and beyond the call of duty" from the National Animal Interest Alliance (NAIA), a fraction of the experience and accolades Relator has received over her decades-long career in animal research. *Id.*

Relator was initially hired by Defendant, Baylor College of Medicine's ("BCM") Center for Comparative Medicine ("CCM") in July 2005 as the Associate Director of Training. *Id.* at ¶ 32. Relator rose through the ranks of CCM, eventually becoming its Director in July 2011, a position she remained at until her termination on October 2, 2019. *Id.* As the director, "Relator oversaw the entire animal care program for the animals involved in biomedical research at BCM." *Id.* at ¶ 33. She "successfully developed a comprehensive training and education program for laboratory animal technicians of all levels, including for 200+ staff members supporting a diverse range of laboratory animals across multiple buildings." *Id.*

As a research institute performing biomedical research, BCM was the recipient of grants from the NIH. *Id.* at ¶ 51. To receive these grants, BCM assured the government "that its biomedical research was compliant with IACUC-approved [Institutional Animal Care and Use Committee] protocols."

*Id.* at ¶ 72. Additionally, BCM assured that it would provide notice if any "biomedical research was not conducted in accordance with IACUC-approved protocol." *Id.* at 73. This notice had to be provided to the NIH Office of Laboratory Animal Welfare ("OLAW"), which regulates biomedical research. *Id.* at ¶ 51. In addition to the institutional assurances and animal protocols, BCM Principal Investigators ("PI's") would assure with each grant application and progress report that the research would be conducted in accordance with the institutional assurance and IACUC-approved protocol. *Id.* at ¶ 68.

In her Amended Complaint, Relator has provided numerous examples of noncompliance which went unreported to allow BCM to continue receiving federal funding. *See* Am. Compl. ¶¶ 75–112. For example, the Davis Lab received over $9 million in grants to "develop interventions to improve the growth and health of premature human infants" by researching young pigs. *Id.* at ¶¶ 76–82. The Richards Lab received over $16 million in federal funding for research involving mice relating to ovarian cancer. *Id.* at ¶¶ 83–89. The Noebels Lab received federal funding to use mice to research epilepsy. *Id.* at ¶¶ 90–96. Likewise, the Rosen Lab and Zhang Lab also received funding to use mice to research breast cancer. *Id.* at ¶¶ 97–112.

All of these labs violated numerous federal policy provisions including:

- Allowing unauthorized, untrained, and unqualified individuals to conduct surgeries;

- Botching surgeries, killing research animals during experiments;
- Failing to properly administer anesthesia during surgery and post-operative pain medicine;
- Failing to monitor animals during surgery and post-operatively; and
- Failing to report continuing violations to OLAW.

*See* Am. Compl. Ex. A. Additionally, the individual laboratories failed in various regards including failing to properly euthanize research animals, violating DEA and OLAW requirements for drug use and maintenance, and improperly breeding research animals. *Id.*

Throughout this time, BCM continued to deceive the government. In fact, in 2018, OLAW placed BCM on enhanced reporting. Am. Compl. ¶ 123. In response to the enhanced reporting requirement, BCM certified to OLAW that only certified and trained individuals would perform surgeries. *Id.* at 124. However, BCM continued to allow "dozens of individuals to perform hundreds of surgeries without demonstrating proficiency under the TA program." *Id.* at 125 (emphasis omitted). One egregious example is from September 4, 2019, when "an untrained individual improperly laced a wire (telemetry lead) through the skin externally on a research mouse instead of implanting it, as required by IACUC-approved protocol." *Id.* at ¶ 131. The mouse ultimately had to be euthanized due to the botched surgery by an untrained individual. *Id.* at

¶ 132. What is even more egregious is that BCM continued to falsely report to OLAW that there were no problems during this experiment and did not correct its promise to OLAW that no individuals would perform surgery until they graduated successfully from the TA program. *Id.* at ¶¶ 124, 133.

Throughout her time with BCM, Relator would routinely express her concerns regarding unauthorized, untrained, and unqualified individuals performing surgeries. *Id.* at ¶ 161. For example, on May 12, 2018, Relator signed a letter addressing concern about untrained individuals performing surgeries. *Id.* at ¶ 163. Thereafter, "Relator began to suffer ongoing harassment and retaliation" *Id.* at ¶ 164. On October 2, 2019, only days after an on-site review by OLAW, Relator was terminated from her employment. *Id.* at ¶¶ 165–166.

In response to the continued fraud, Relator, in 2021, provided numerous documents to the Department of Justice. Among these documents are numerous emails involving Relator showing that she was central to the undercovering of the massive fraudulent scheme against the United States government.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a party is entitled to dismissal when the opposing party fails to state a claim upon which relief may

be granted. *See* Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. In considering a motion to dismiss for failure to state a claim, a Court must accept all factual claims in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *See Harmon v. City of Arlington*, 16 F.4th 1159, 1162 (5th Cir. 2021). Because a complaint must be liberally construed in favor of the plaintiff, a motion to dismiss under Rule 12(b)(6) is generally viewed with disfavor and is rarely granted. *See Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009).

## SUMMARY OF THE ARGUMENT

Relator has properly pleaded a complaint under the False Claims Act. First, Relator's complaint is not barred under the public disclosure bar. Relator

has direct and independent knowledge of the allegations in this case that are based on documents and information not previously disclosed via public means.

Next, Relator has adequately pleaded all required elements for a False Claims Act violation. In her Amended Complaint, Relator alleges specific instances of grants received by BCM and the violations committed by the labs which received those grants. Additionally, Relator sufficiently alleges that the false assurances submitted by BCM were material to the government's funding decision.

Finally, Relator has adequately pleaded a claim for retaliation. Relator was terminated only after her continued concerns regarding the program were brought up. After Relator voiced these concerns, and after a review by the government into BCM's practices, Relator was terminated from her employment.

## LAW AND ARGUMENT

### I. There was not a Public Disclosure.

In the Fifth Circuit, courts apply "a three-part test, asking '1) whether there has been a "public disclosure" of allegations or transactions, 2) whether the qui tam action is "based upon" such publicly disclosed allegations, and 3) if so, whether the relator is the "original source" of the information.'" *United States ex rel. Schweizer v. Canon, Inc.*, 9 F.4th 269, 275 (5th Cir. 2021) (quoting

*United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011).

**a. *The Complaint is Not Based Upon Publicly Disclosed Information.***

"A plaintiff's FCA complaint is based upon public disclosures if 'one could have produced the substance of the complaint merely by synthesizing the public disclosures' description of the joint venture scheme[.]'" *United States ex rel Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 144 (5th Cir. 2017) (quoting *Jamison*, 649 F.3d at 331). Relator has produced substantial additional evidence which has not been publicly disclosed. In fact, Relator has produced numerous documents to the government that were previously unknown.[1] The information currently known to BCM is only the "tip of the iceberg" of the information provided by Relator.

Additionally, this is not a case of Relator simply "stumbling upon" the information, but it is instead one in which Relator was central in uncovering and reporting the fraud:

> Courts must "look to the factual subtleties of the case before [them] and attempt to strike a balance between those individuals who, with no details regarding its whereabouts, simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim."

[1] Many such documents are marked "Confidential" and as such, Relator has not attached them as exhibits at this time until a protective order can be entered.

*United States ex rel. Reagan v. E. Texas Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 177 (5th Cir. 2004) (quoting U*nited States ex. rel. Laird v. Lockheed Martin Eng'g & Sci. Servs., Co.*, 336 F.3d 346, 356 (5th Cir. 2003)). Relator was the central figure in BCM's animal research. She is a well-qualified and expert in the field of animal research. *See* Am. Compl. ¶¶ 30–31. Relator was at the front and center of the fraud and therefore was able to provide critical information to BCM's fraudulent activities. For example, Relator uncovered the fact that, while BCM promised the Government that it would no longer permit untrained researchers to conduct surgery on research animals, in reality BCM knowingly failed to institute any mechanism to actually prevent untrained researchers on existing protocols from conducting such surgeries. *See* Am. Compl. ¶¶ 123-26. Relator provided numerous examples and documents outlining this continued fraud.

***b. Relator's Disclosure was Critical in Setting the Government on the Trail of Fraud by BCM.***

Relator not only provided numerous documents and evidence to the government in response to BCM's fraud, she also served to provide the crucial link in the connection of the fraud with BCM as an institution. A public disclosure "must allow the Government to identify the defendant as the alleged wrongdoer." *United States ex rel. Colquitt v. Abbott Lab'ys*, 864 F. Supp. 2d 499, 522 (N.D. Tex. 2012), *aff'd sub nom. United States ex rel. Colquitt v. Abbott*

*Lab'ys*, 858 F.3d 365 (5th Cir. 2017) (citing *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 329 (5th Cir. 2011); *see also United States ex rel. Gear v. Emergency Med. Assoc. of Ill., Inc.*, 436 F.3d 726, 729 (7th Cir.2006). Therefore, information that discloses alleged wrongdoing by only a portion of a group or industry does not disclose allegations or transactions concerning every member of that group or industry. *Colquitt*, 864 F. Supp. 2d at 522; *see also United States ex. rel. Baltazar v. Warden et al.*, 635 F.3d 866, 869 (7th Cir. 2011). None of the documents or articles produced by Defendant specifically tie BCM to the fraudulent transactions. It was Relator, who provided the crucial "link" that tied BCM's continued assurances to the government in order to receive research grants.

Looking only to the publicly disclosed documents produced by Defendants, any number of people or institutions could be at fault. Thus, the articles would not have placed the Government "on the trail of fraud." *United States ex rel. Sonnier v. Standard Fire Ins. Co.*, 84 F. Supp. 3d 575 (S.D. Tex. 2015). Not a single article shows that BCM was fraudulently assuring the government it was in compliance in order to continue to receive grants.

***c. Dismissal is Inappropriate at this Time.***

Defendants argue for dismissal of Relator's case on grounds that the information was previously publicly disclosed. In support of this, Defendant

cites numerous articles it claims are public disclosures. However, Defendant ignores the overwhelming amount of information provided by Relator. In fact, much of the information provided by Relator may not be known by BCM as discovery has not commenced.

Defendants cite *Schweizer* for the proposition that a claim is barred by the public disclosure bar if even part of the claim is based off publicly available information. *United States ex rel. Schweizer*, 9 F.4th at 271. However, *Schweizer* is readily distinguishable as it involves a previous False Claims Act lawsuit and settlement regarding the exact same allegations. *Id.* Importantly, the Court found that "[a]t least one of the contracts asserted (and settled) against Océ—the '60M' contract—is the identical contract asserted in her suit against Canon. Moreover, her complaint against Canon draws largely, if not exclusively, from her complaint against Océ." *Id.* at 276. Here, Relator's Complaint does not draw from a previous False Claims Act lawsuit but instead is based entirely off information known and provided to the United States Government by Relator.

## II. Relator's First Amended Complaint Contains Sufficient Detail in Accordance with Fifth Circuit Precedent.

After first asserting in its Motion to Dismiss that its flagrant violations of its institutional assurances and certifications were publicly known, BCM attempts to shift gears and argue that it lacks notice as to what it has done

wrong. The nature of the fraud scheme in this case is straightforward, however, and BCM is a highly sophisticated defendant. As a condition of receiving hundreds of millions of dollars in Federal grants, BCM made a series of assurances and certifications to the Federal government that it would conduct animal research in accordance with a very specific set of animal protocols. Am. Compl. ¶¶ 65–70. Throughout the time BCM made these assurances and certifications, it knew that it was violating the terms of those certifications and assurances. *Id.* at ¶¶ 74–111, Am. Compl. Ex. A. BCM lied in its assurances and certifications because it knew that these certifications and assurances were very important to the Federal government and that it would not receive these grant funds otherwise. Am. Compl. ¶¶ 72–112, Am. Compl. Ex. A. At a more granular level, the Amended Complaint identifies specific labs (with specific individual Principal Investigators) during very specific time periods that give BCM a high degree of specificity in defending these claims.

BCM attacks the Amended Complaint as lacking sufficient specificity as to specific claims. This standard is inconsistent with Fifth Circuit precedent (and the precedent of its sister circuits) and runs counter to the purposes of the False Claims Act. Like most circuits, the Fifth Circuit does not require the identification of specific claims, and specifically rejected the notion that Rule 9(b) always requires the identification of a specific false claim for a viable FCA case: "a relator's complaint, if it cannot allege the details of an actually

submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paid." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009). Grubbs directs that the inquiry should be "context specific and flexible and must remain so to achieve the remedial purpose of the False Claims Act." *Id.*

The Amended Complaint alleges a number of specific facts about the nature of BCM's fraud scheme.

The Amended Complaint alleges that PI Teresa Davis' laboratory violated Protocol AN-636 between January 2017 and June 2018 in NIH grants totaling $9 million by allowing "unauthorized, untrained, and unqualified individuals to conduct surgeries," botching surgeries and killing research animals during experiments, failing to properly euthanize animals, and a number of other specific ways. BCM lied to the Federal government about these activities in its annual institutional assurance and its grant-by-grant certifications, and in its correspondence with OLAW.

The Amended Complaint alleges that PI Joanne Richards violated Protocol AN-721 between August 2017 and December 2019 in NIH grants totaling $16 million. Like the Davis Lab, the Richard Lab allowed "unauthorized, untrained, and unqualified individuals to conduct surgeries," botched surgeries and killed research animals during experiments, failed to properly administer pain medication for surgical procedures, used expired

drugs in violation of DEA and OLAW regulations, among other violations. As before, BCM lied to the Federal government about these activities in its annual institutional assurance and its grant-by-grant certifications, and in its correspondence with OLAW.

The Amended Complaint alleges that PI Jeff Noebels violated Protocol AN-602 between February 2016 and February 2018 in grants totaling $23 million. The Noebels Lab allowed "unauthorized, untrained, and unqualified individuals to conduct surgeries," botched surgeries and killed research animals during experiments, failed to properly administer pain medication for surgical procedures, among other violations. BCM lied to the Federal government about these activities in its annual institutional assurance and its grant-by-grant certifications, and in its correspondence with OLAW.

The Amended Complaint alleges that PI Jeff Rosen violated Protocol AN-504 between July 2016 and August 2019 in grants totaling $32 million. The Rosen Lab committed many of the same violations as the other labs, with several additional violations, such as failing to monitor research animals postoperatively and violating DEA and OLAW regulations on drug use and maintenance. As in the previous labs, BCM lied to the Federal government about these activities in its annual institutional assurance and its grant-by-grant certifications, and in its correspondence with OLAW.

The Amended Complaint alleges that PI Xiang Zhang violated Protocol

AN-5734 from June 2016 to October 2019 in grants totaling $10 million. The Amended Complaint outlines a myriad of specific ways in which the Zhang Lab violated this animal protocol. (P. 109). BCM lied to the Federal government about these activities in its annual institutional assurance and its grant-by-grant certifications, and in its correspondence with OLAW. BCM also "knowingly allowed the labs to commit the same violations again and again, and it knowingly failed to disclose the scope, severity, and continuing nature of the serious noncompliance to prevent the Government from turning off the funding spigot." Am. Compl. at ¶ 111.

The Amended Complaint pleads all factual aspects of this fraud scheme – the who, what, when, where, and why of the fraud. Importantly, the fraud scheme outlined in the Amended Complaint would also necessarily result in false claims to the United States, because the false express certifications made by BCM were required in order for the Davis Lab, Richard Lab, Noebels Lab, and Rosen Lab to apply for and continue to receive NIH grants. Additionally, by making false reports to the Government, BCM violated animal welfare laws and regulations and its Assurance. *Id.* at ¶¶ 63, 73, 142. Without this Assurance, the Government would have stopped providing *any* federal funding. *Id.* at ¶ 60.

Contrary to BCM's assertions that this detailed factual overview does not provide them with sufficient detail to defend this case, these allegations

are specific and precise. The animal care violations correspond to specific animal protocols that BCM is in possession of, and these animal protocols correspond with very specific grants and corresponding claims for payment to the United States. The express false certifications made by BCM that will be the centerpiece of this case could likely be retrieved by BCM within minutes, and they most likely have been.

FCA case law makes clear that defendants should not be allowed to use 9(b) as a sword when they alone have access to the key documents proving their FCA violations. *See Grubbs,* 565 F.3d at 191 ("While Rule 9(b) stands as a hurdle preventing discovery when a complaint fails to sufficiently define its claims, it does not do away with discovery altogether by allowing access to discovery only when the complaint already contains all the information necessary to succeed at trial.").

BCM mischaracterizes its conduct as a simple violation of a guidance document, namely the PHS Policy. It ignores the Amended Complaint's recitation of the multi-layered series of assurances and certifications related to the Animal Welfare Act, the HREA, and the Code of Federal Regulations rules that implement these laws. By falsely certifying in its institutional assurance and falsely certifying in grant-by-grant PI certifications, BCM is not only lying about its compliance with the PHS Policy, but also the HREA, AWA, and their implementing regulations.

## III. The Amended Complaint Satisfies the Materiality Standard Under the FCA.

The FCA defines "material" as "having a ***natural tendency*** to influence, or ***be capable*** of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4) (emphasis added). In *Escobar*, the Supreme Court explained that the FCA's materiality requirement had common law roots, and that "[u]nder any understanding of the concept, materiality look[s] to the ***effect on the likely or actual behavior*** of the recipient of the alleged misrepresentation." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 191, 136 S. Ct. 1989, 2002, 195 L. Ed. 2d 348 (2016) (emphasis added) (quotation omitted). Looking at both tort law and contract law, the Court next described two circumstances in which a misrepresentation would be material: (1) when a reasonable person would attach importance to the matter in determining a choice of action; or (2) when the defendant knows or has reason to know that the recipient of the representation attaches importance to the matter (even if a reasonable person would not). *Id.* at 2002-03.

Under *Escobar*, the analysis of materiality under the FCA involves multiple factors, including:

> (1) The Government's decision to expressly identify a provision as a condition of payment; (2) whether the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual

> requirement or if, with actual knowledge of the non-compliance, it consistently pays such claims and there is no indication that its practice will change; and (3) whether the noncompliance is minor or insubstantial or if it goes to the very essence of the bargain.

*United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 831 (6th Cir. 2018) (quoting *Escobar*, 136 S.Ct. at 2003 & n.5). *See also* 136 S.Ct. at 2001 ("materiality cannot rest on 'a single fact or occurrence as always determinative'") (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)); *See also United States ex rel. Escobar v. Universal Health Servs.*, 842 F.3d 103, 109 (1st Cir. 2016) (on remand, stating that the Supreme Court's decision "makes clear that courts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive").

Here, the First Amended Complaint's well-pleaded facts establish that Defendant's fraud was material. The U.S. Government detailed two separate sets of laws that "govern the use of animals in biomedical research." Am. Compl. ¶¶ 5256. As an express condition of accepting an award or grant for biomedical research, grantees are required to "execute an 'approved Animal Welfare Assurance' and 'bear ultimate responsibility for compliance with the PHS Policy in all PHS supported activity and all activity involving vertebrates, regardless of funding source.' The grantee must certify that its complying with its Assurance in its annual report to OLAW," otherwise its grants may be

"'suspended or revoked' and its funding ceased." Am. Compl. ¶¶ 58-60. However, this is not a mere certification—grantees such as BCM must also establish a specialized committee ("IACUC") whose sole purpose is to ensure compliance with these federal requirements. *Id.* at ¶¶ 61-66. These codified requirements are "fundamental and critical to ensure rigorous, valid, and reliable scientific data collection," for which the U.S. Government is paying. *Id.* at ¶ 67. Although these requirements do not automatically determine materiality, they remain an important factor under *Escobar*.

The severity of the noncompliance is also important—is it "minor or insubstantial" or does it go to the "very essence of the bargain"? 892 F.3d at 834. Here, The U.S. Government granted funds to BCM in order to conduct biomedical research that BCM promised will "advance the scientific understanding and treatment of human disease and conditions such as breast and prostate cancer, heart disease, central nervous system disease, diabetes, liver and digestive diseases, neurological disorders like epilepsy, eye diseases, newborn health and development…" Am. Compl. ¶ 49. The purpose of the PHS policy and IACUC-approved protocol is "both fundamental and critical to ensure rigorous, valid, and reliable scientific data collection." *Id.* at ¶ 67.

In *Prather*, the Sixth Circuit looked to guidance documents and manuals issued by the government in determining the essence of the bargain and the materiality of noncompliance with timing certifications and held that these

documents supported "Prather's assertion that the timing requirement is material" and "Prather's allegation that the government has consistently emphasized the timing requirement." *Prather*, 892 F.3d at 835, 836. Here, the U.S. government did not merely issue guidance documents—it codified, in detail, not only the requirements for the Assurance, but also demanded the establishment of a specialized committee with ongoing monitoring and reporting requirements. Am. Compl. ¶¶ 58-70. These laws and regulations emphasize the importance the government places on the effect that the treatment of animal test subjects has on the integrity and reliability of the studies funded by the U.S. Government.

***a. Relator denies that the Government continued to pay BCM with full and actual knowledge of the noncompliance.***

Defendant also argues that the Government's continued payments despite awareness of "certain instances" of noncompliance shows the immateriality of the violations. While continued payment is a factor in weighing materiality, Defendant's argument ignores crucial facts. Although Relator admits that the Government had some ***limited*** knowledge of the Defendant's noncompliance, the Government did not have ***full*** knowledge of the "nature, extent, and timing of its [Defendant's] continuing noncompliance." Am. Compl. ¶ 43. For example, despite assurances to OLAW that "'[n]o surgery will be conducted until proficiency is verified,'" Defendant "knowingly allowed

dozens of individuals to perform hundreds of surgeries without demonstrating proficiency." *Id.* at ¶¶ 124–25. In one experiment, the use of untrained individuals led to a botched surgery and the euthanization of a research animal. *Id.* at ¶¶ 131–32. Furthermore, Defendant "falsely reported to OLAW that there were no problems with the research animals in the experiment, hid from OLAW the fact that more than one untrained researcher had performed surgeries after being placed on enhanced reporting, and failed to report to OLAW the death of two research animals." *Id.* at ¶ 133.

In *United States ex rel. Montcrieff v. Peripheral Vascular Associates, P.A.*, No. SA-17-CV-00317-XR, 2023 WL 139319 (W.D.Tex. Jan. 9, 2023), the Court held that "the Government's action or inaction is only probative after it acquires 'actual knowledge' of the fraud." *Id.* at 9. In *Montcrieff*, a meeting was held between an employee of the company at issue and the government, to discuss the company's billing practices. However, the employee admitted that only one patient file was discussed and was not aware of the proportion or number of files produced to the government that included prematurely billed claims. Therefore, "the jury could have easily concluded that the Government did not necessarily gain 'actual knowledge' from the 2018 meeting." *Id.*

Defendant relies on *United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645 (5th Cir. 2017) in arguing that continued payment by the Government shows the lack of materiality of its noncompliance; however, in

doing so, Defendant ignores the drastic difference in underlying facts. In *Harman,* the Government agency issued a memo explicitly stating that despite the design change to the guardrails at issue, the guardrails remained eligible for payment at all times. *Id.* at 663. Furthermore, the Fifth Circuit noted the "gravity and clarity of the government's decision here" and stated, "this case is not about inferring governmental approval from continued payment. Here the government has never retracted its explicit approval." *Id.* at 663–64. As the Court in *Montcrieff* highlighted, "In *Harman*, there was ample and uncontroverted evidence that the Government had actual knowledge of the purported fraud, *and* that the Government made an informed and intentional decision in response." 2023 WL 139319, at 10. Similarly, in *United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d. 890 (9th Cir. 2017), the Ninth Circuit reversed the dismissal of the relators' claims, in part noting that, "the parties dispute exactly what the government knew and when, calling into question its 'actual knowledge.' Although it may be that the government regularly pays this particular type of claim in full despite actual knowledge that certain requirements were violated, such evidence is not before us." *Id.* at 906–07. The Court held that, "The issues raised by the parties here are matters of proof, not legal grounds to dismiss relators' complaint." *Id.* at 907.

In addition to continued payments, the Supreme Court in *Escobar* also looked to if the Government had "signaled" a "change in position." 136 S.Ct. at

2004. Although the Government did not have full and actual knowledge of the noncompliance, the limited knowledge it did have was enough to place Defendant on "enhanced reporting," which is "only one step removed from termination of funding." Am. Compl. ¶ 123. While Defendant was on enhanced reporting, OLAW Deputy Director Axel Wolff made a site visit and made clear the materiality of noncompliance:

> The assurance states, signed by your institutional official, that you will report. That is the absolute expectation, and you'll report promptly and you'll fix things promptly. If investigators think, well, I better not report this because it could impact my grant, your grant will be much more impacted if the institution as a whole doesn't fulfill this requirements [sic] under the assurance…it's extremely important that you all continue reporting, continuing monitoring your program, to protect your research funds.

*Id.* at ¶ 135. The Supreme Court in *Escobar* also looked to if "(1) a reasonable man would attach importance to it in determining his choice of action in the transaction or (2) if the defendant knew or had reason to know that the recipient of the representation attached importance to the specific matter in determining his choice of action." 136 S.Ct. at 2002–03 (internal quotation

marks omitted). Being placed under enhanced reporting, even without full knowledge of the scope of the noncompliance, as well as the direct statement by OLAW Deputy Director Axel Wolff, meets the reasonable man standard for materiality under either prong.

***b. Relator is not required to cite to other instances where the Government refused to pay claims based on noncompliance with the PHS Policy.***

In *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d. 155 (5th Cir. 2019), the Fifth Circuit overturned the district court's dismissal of relators' claims on the grounds of materiality. In doing so, the Court stated, "No one factor is dispositive, and our inquiry is holistic." *Id.* at 161. The Court also looked to the Sixth Circuit's approach to weighing *Escobar* factors at the motion to dismiss stage, finding it "persuasive." *Id.* at 162. In weighing past government behavior in *Prather*, the Sixth Circuit stated,

> The Supreme Court was explicit that none of the factors it enumerated were dispositive. Thus, it would be illogical to require a relator (or the United States) to plead allegations about past government action in order to survive a motion to dismiss when such allegations are relevant but not dispositive.

892 F.3d at 834. After analyzing the Sixth Circuit's approach, the Fifth Circuit in *Lemon* then went on to note that, "[i]ndeed, the Government's legal investigations are often conducted in secrecy; we do not expect Relators to know precisely the Government's prosecutorial practices without the benefit of

discovery." *Lemon*, 924 F.3d at 162. The holistic nature of determining materiality under *Escobar* is a very fact-intensive and is often a "matter for the jury." *Montcrieff*, 2023 WL 139319, at 10. *See also United States v. Hodge*, 933 F.3d. 468, 474 (5th Cir. 2019) (affirming denial of motion for judgment as a matter of law on materiality).

**IV. Relator has adequately alleged retaliation.**

To state a claim for retaliation in violation of the False Claims Act, 31 U.S.C. § 3730, Relator must allege that 1) she was engaged in protected activity, 2) BCM knew she was engaged in such conduct, and 3) BCM retaliated against Relator because of the conduct. *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 241 (5th Cir. 2019). The Amended Complaint specifically alleges:

- "On May 12, 2018, Relator, along with 10 other . . . employees . . . penned a letter to the IACUC addressing their collective ongoing concerns about BCM's failure to ensure individuals were trained before allowing them to perform surgeries" and she "continued to press the issue at a meeting with the IACUC in or around June 2018."
- When the IACUC continued to refuse to take action, after June 2018, Relator "sent the then-IO (Adam Kuspa) several additional correspondences . . . asking that Kuspa and the IACUC reconsider their position."

- She specifically raised the concern that "BCM was falsely reporting to OLAW that it was complying with training requirements" during this time period.
- This activity took place in the context of (1) OLAW ordering BCM to implement mandatory training in order to be compliant with its federal obligations, (2) OLAW placing BCM on enhanced reporting—threatening the withdrawal of funding—and BCM promising OLAW that it had implemented mandatory training, and (3) OLAW's visit to BCM in which Axel Wolff informed BCM that its contract with the government mandated accurate reporting, and failure to do so would impact federal funding.
- The day after Relator informed her supervisor that she had alerted OLAW to the fact that BCM was not compliant with federal law, she was terminated, without any warning or counseling as required under BCM's progressive discipline policy.

Am. Compl. ¶¶ 122–23, 135, 162, 163, 165, 166, 168. Understood in the proper context, Relator's actions were clearly protected activity, BCM knew she was engaged in this activity, and BCM retaliated against her (by firing her) because of the conduct. Unlike the claims related to fraud, "FCA retaliation does not sound in fraud and thus need not be pleaded with particularity[.]" *United States ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-CV-3396, 2014 WL 2618158,

at *23 (S.D. Tex. June 12, 2014), *on reconsideration in part sub nom. Ruscher v. Omnicare Inc.*, No. 4:08-CV-3396, 2014 WL 4388726 (S.D. Tex. Sept. 5, 2014). Because Relator has alleged the three elements necessary to state a claim for retaliation under the liberal pleading standards of Federal Rule of Civil Procedure 8, BCM's Motion to Dismiss this claim should be denied.

***a. Relator adequately pleaded that she engaged in protected conduct.***

With respect to the first element, Relator engaged in protected conduct if her actions were "aimed at matters that reasonably could lead to a viable claim under the Act" and "a reasonable employee in the same or similar circumstances might believe that her employer is committing fraud against the government." *Miniex v. Houston Hous. Auth.*, 400 F. Supp. 3d 620, 640 (S.D. Tex. 2019). Moreover, under the 2010 amendments to the False Claims Act, Congress expanded whistleblower protection by adding "other efforts to stop 1 or more violations of this subchapter" as protected conduct. *See Thomas v. ITT Educ. Servs., Inc.*, 517 F. App'x 259, 262 (5th Cir. 2013).

Relator believed that BCM was committing fraud and investigated the systemic false reports at BCM. She made numerous efforts to stop ongoing fraud against the government during and after the time that OLAW had informed BCM that training was mandatory under federal regulations and that failing to report and fix issues was a violation of the Assurance that would

lead to withdrawal of federal funds. These efforts included requesting that BCM leadership mandate a training program so that BCM would no longer be "falsely reporting to OLAW that it was complying with training requirements," penning a letter to the IACUC raising concerns about failure to train researchers, corresponding directly with IO Adam Kuspa regarding this issue, and reporting programmatic noncompliance directly to OLAW. Am. Compl. ¶¶ 162, 163, 165. These actions were intended to prevent BCM from making fraudulent claims and certifications of compliance, and/or to prevent OLAW from continuing to provide federal funding based on false claims. Accordingly, she engaged in protected conduct entitling her to protection from retaliation.

***b. Relator adequately alleged that BCM knew of her protected conduct.***

In order to meet the second prong of the test, Relator must plead that BCM was "on notice that the employee was investigating fraud" including by taking "any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility." Dangers. *United States ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597, 607–08 (S.D. Tex. 2012). Relator alleged that she personally informed IACUC members, the Chair of the IACUC, and Adam Kuspa (the Institutional Official responsible for signing the Assurance and making reports of "any serious or continuing noncompliance" with the PHS Policy to OLAW) of the systemic noncompliance

with relevant law and the false reports to the government promising training. Am. Compl. ¶¶ 134–35, 157, 163. Importantly, these individuals included her supervisor Dean Mary Dickinson, who was present at many of the meetings at which Dr. Buckmaster raised her concerns. *Id.* at ¶ 167. By any standard, much less the permissive Rule 8 standard, this pleading suffices to state a claim.

### ***c. Relator adequately pleaded that Defendant retaliated against her for engaging in protected conduct.***

Finally, Relator must allege that she suffered retaliation "motivated by the protected activity[,]" a showing which is "not onerous; the plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *George*, 864 F. Supp. 2d at 609. The Amended Complaint alleges that Relator was terminated for reporting and investigating her reasonable belief that BCM was engaging in fraud against the government. As such, Dr. Buckmaster was terminated in retaliation for engaging in protected conduct, which satisfies the third element of 31 U.S.C. § 3730(h). The Fifth Circuit has explained that this standard is easy to meet: "the prima facie case's causation requirement could be satisfied by showing 'close timing between an employee's protected activity and an adverse action against him.'" *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 241 (5th Cir. 2019) (quoting *Feist v. Louisiana, Department of Justice, Office of the Attorney General*, 730

F.3d 450, 454 (5th Cir. 2013)) (reversing grant of summary judgment to defendant in False Claims Act retaliation case and describing this standard as the "close-timing-is-enough" standard). Relator alleges that BCM fired her *one day* after she alerted her supervisor to the fact that she had informed OLAW of BCM's systematic noncompliance with federal law when BCM was on enhanced reporting and falsely claiming to the government that it had implemented mandatory training in order to maintain federal funding. Am. Compl. ¶¶ 165–66. Under Fifth Circuit precedent, this is enough to state a claim.

## CONCLUSION

Relator has adequately plead all elements and her Complaint should not be dismissed for failure to meet the pleading standards under Fed. R. Civ. P. 12(b)(6) and 9(b), in the alternative, Relator respectfully requests leave of Court to file her Second Amended Complaint.

Dated: July 31, 2023

Respectfully Submitted,

/s/ Andrea L. Meza

Andrea L. Meza
Texas Bar No. 24090861
Government Accountability Project
P.O. Box 830351
San Antonio, TX 78283
Phone: (202) 463-1312
andream@whistleblower.org

/s/ John R. Thomas, Jr.
John R. Thomas Jr.
Attorney-In-Charge
*Pro Hac Vice*
VSB No. 75510
Hafemann Magee & Thomas
P.O. Box 8877
Roanoke, VA 24014
Phone: (912) 221-4441
jt@fed-lit.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to all counsel of record.


/s/ John R. Thomas, Jr.
John R. Thomas Jr.
Attorney-In-Charge
*Pro Hac Vice*
VSB No. 75510
Hafemann Magee & Thomas
P.O. Box 8877
Roanoke, VA 24014
Phone: (912) 221-4441
jt@fed-lit.com